# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00005-CV

**Appellant, THPD, Inc.//Cross-Appellant, Continental Imports, Inc.**

**v.**

**Appellees, Continental Imports, Inc., TBT, Inc. d/b/a Auto Gallery
and Norm P. Taylor//Cross-Appellee, THPD, Inc.**

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT
### NO. 96-495-C26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING

## O P I N I O N

THPD, Inc., and Continental Imports, Inc., each appeal a judgment that awarded THPD $83,932.00 on causes of action against Continental for conversion, theft, and negligence; granted THPD declaratory relief; and awarded THPD $125,000 in attorney's fees. The underlying facts, presented in evidence during a two-week jury trial, involve a series of commercial transactions that we will describe below. To summarize the parties' arguments on appeal, Continental asserts that there is no legal support for any of the relief awarded against it, while THPD urges that the district court erred in refusing to impose joint and several liability on Continental for a much larger damages award the jury imposed against a co-defendant. We will affirm the district court's judgment in part, and reverse and render in part.

## BACKGROUND

**Norm Taylor and Auto Gallery**

At the center of the underlying controversy was a used car dealer named Norm Taylor. Taylor had been in the car sales business since 1979. In 1986, Taylor went into the wholesale car business for himself, obtaining a Texas dealer's license and incorporating a company, TBT, Inc. In approximately 1991 or 1992, Taylor opened a retail outlet on I-35. At relevant times, Taylor and TBT did business under the name "Auto Gallery." We will refer to Taylor, TBT, and Auto Gallery simply as "Taylor" except when the distinction is relevant.

Several witnesses explained that car dealers commonly finance their inventories through an arrangement known as "floor planning." Under these arrangements, generally speaking, investors loan funds to car dealers to finance car purchases and carrying costs, with the loans being secured by the cars as collateral. As each car is sold, according to the evidence at trial, the dealer typically repays the corresponding loan, plus accrued interest, and any fees or other charges that might be required under the specific floor-planning arrangement.

During the relevant time period, Taylor described having continual problems generating sales revenues sufficient to cover his loan repayments and interest, not to mention his overhead. As revenues proved inadequate to meet his obligations as they came due, Taylor resorted to covering the shortfalls with funds loaned to finance other cars, in the expectation or hope that he might ultimately make up the difference with revenues generated in subsequent sales. Instead, the shortfalls, as Taylor described it, "just snowball[ed]." In late 1993 or early 1994, the floor planner who had been financing Taylor's operations since 1988 or 1989, Milton Neeley,

2

ordered an accounting. The accounting revealed that Taylor had been defrauding Neeley and was "upside down" or "out of trust"—outstanding obligations exceeded the value of collateral—by approximately $150,000. Neeley ended their floor-planning arrangement, threatened to sue Taylor, and Taylor eventually agreed to repay Neeley the amount outstanding in installments of $2,000 or $2,500 per month.

**Dr. Hendrix and THPD, Inc.**

In March 1994, shortly after Neeley ended their floor-planning relationship, Taylor entered into a floor-planning arrangement with Dr. Thomas Hendrix. Hendrix, an ophthalmologist in Taylor, Texas, was a "muscle car" enthusiast and frequent visitor to Auto Gallery. The evidence was disputed concerning the extent to which Hendrix was aware of Taylor's history with Neeley. Taylor and Hendrix memorialized their arrangement in a one-page "Ag[]reement with Auto Gallery." Under the Agreement, Hendrix agreed to loan money to Taylor to purchase cars. Taylor, in turn, agreed that "Hendrix would be repaid for the cars when they are sold and funded," including "reimburse[ment] for money lent on the car plus 1 (one) % of the money lent on the car and plus interest accrued on the car from time of purchase to the time of funding. . . . The interest rate shall be 10% or the prime rate which ever is higher."

By May 1996, Taylor estimated that Hendrix had about $300,000 in outstanding loans to him. Taylor described Auto Gallery's financial condition at this time as "very poor." He attributed these difficulties to "very poor decisions on purchases. We got very heavy into the muscle car market, [a] very individualized market." Consequently, "the daily sales were not happening the way you need . . . to cover your monthly expenses, your rent, your insurance, [and] I still had to

3

purchase vehicles that I could sell on a quick basis to generate any type of income." He added, "it just snowballs. You're borrowing from Peter to pay Paul. The bank calls and says, . . . 'You're X number of dollars overdrawn this morning. You need to get those funds in the bank.' I had to find some—I had to sell cars at losses . . . it was my decision to take losses . . . just to get funds in the bank to cover that day and hope to make it better tomorrow."

By early 1996, Taylor's monthly expenses included—along with amounts owed to Hendrix, Neeley, and payments due under another note to an investor named Harry McAdams—approximately $3,000 in monthly rent to Hendrix at a new location for Auto Gallery on FM 620 near Cedar Park. Taylor regarded this new location as his "last shot . . . to get this turned around. That building was . . . my hope, that by magic, by building that showroom, having these beautiful cars, that we would . . . strike gold."

Between August 1995 and early 1996, Taylor bounced several checks, including some checks to Hendrix. At the time, Taylor and Hendrix were using a joint checking account. In the ensuing months, Hendrix closed the joint account and undertook various measures that served to provide him greater protection in his dealings with Taylor, though the evidence was disputed whether this was Hendrix's specific motivation. Hendrix formed a corporation, THPD, Inc., through which he would thereafter conduct his floor planning with Taylor.[1] The corporation did business as "AG Auto." We will refer to this entity as THPD, as it is the party on appeal.

Hendrix also testified that he began attempting to reduce the amount of loans outstanding to Taylor. Furthermore, on May 6, Hendrix executed a promissory note and guarantee

_____

[1] The corporate name represents Hendrix's initials (TH) and those of his wife (PD).

4

with Taylor. The named payee on the note was THPD and the maker was TBT. The note obligated TBT to pay THPD a principal amount of $300,000 on or before August 6, 1996, plus interest accruing at an annual rate of ten percent. The note was secured by a security agreement, executed on the same day, that granted THPD a security interest in TBT's vehicle inventory "whose purchase price is paid in whole or in part with the proceeds of any loans" from THPD to TBT, other vehicles to be identified in schedules, and "all proceeds of all sales and other dispositions of all items of Collateral in which [THPD] has a security interest."

**The downward spiral continues**

The jury heard evidence that Taylor continued to struggle financially during the summer and fall of 1996, bouncing numerous checks and bank drafts. Attributing his acts to "pride, ego, embarrassment" and his hope that he could eventually "make everything right," Taylor engaged in a series of fraudulent financial machinations to keep Auto Gallery afloat. These actions included double- or triple-floor planning cars—obtaining multiple loans secured by the same cars as collateral. In addition to what he estimated was $250-270,000 he had obtained from THPD, Taylor had obtained $100,000 from a company named Lorfam, and $75-80,000 from Harry McAdams.

The jury heard evidence that Taylor's scheme was aided by the fact that Hendrix, unlike typical floor planners, and contrary to the terms of the security agreement between THPD and Taylor, did not keep physical possession of the original certificates of title to the cars that served as collateral for THPD's loans. Instead, throughout the course of their dealings, Hendrix allowed Taylor to retain the titles himself at Auto Gallery. Taylor ultimately used some of these titles in

5

obtaining double- and triple-financing on the corresponding vehicles. Consequently, some of the titles ended up in the possession of creditors other than THPD. There was also evidence that Hendrix failed to independently verify, or checked only occasionally, whether Taylor actually held the titles to the vehicles at Auto Gallery that Taylor had represented were collateral securing THPD's loans. Rather, Hendrix would typically visit Auto Gallery two or three times a week, compare the cars he saw with inventory lists generated by Taylor, and rely on Taylor to answer any questions regarding the cars in which he or THPD had an interest. This provided Taylor an opportunity to misrepresent that THPD had an interest in cars on the Auto Gallery lot when it actually did not and, conversely, hide from Hendrix that he had sold or exchanged cars that had been part of THPD's floor plan without accounting for the proceeds. Further obscuring the state of THPD's collateral, Hendrix, by at least May 1996, had begun permitting Taylor to "roll over" proceeds from the sale of floor-planned cars into the purchase of additional cars rather than requiring car-by-car repayment.

As Taylor put it, "it was a madhouse to keep one floor planner from talking to another." The floor planners eventually did talk to one another, resulting in Taylor's ultimate downfall. In late December 1996, Hendrix shut down Auto Gallery. Taylor was eventually prosecuted and pled guilty to felony criminal charges of misappropriation of fiduciary property.

**THPD's claims against Continental**

Litigation ensued as numerous parties asserted overlapping claims to Taylor's inventory. The vehicles remaining on Auto Gallery's lot when it closed were placed in receivership. The district court gradually sorted out the competing claims and, by the time of trial, the sole remaining parties were Hendrix and THPD, Taylor and TBT, and Continental. In addition to seeking

6

recovery under the note with Taylor, THPD sought damages from Taylor and Continental for the fact that THPD's collateral in the Auto Gallery inventory proved to be inadequate to cover Taylor's outstanding obligations to it. THPD quantified these damages, net of collateral THPD was able to sell and Taylor's restitution payments, as $277,794.97. It presented a damages model that identified and assigned values to twenty-one cars in which THPD had claimed a security interest but ultimately could not recover.

THPD's allegations against Continental centered on the activities of Paul Kitchen. Kitchen was a nationally-recognized expert in the wholesale market for pre-owned "high-end" specialty cars, such as Corvettes, "hard-to-find Mercedes," and Porsches.[2] In March 1996, Kitchen, through his company, Specialty Autos, entered into a written floor-planning arrangement with Continental. We will refer to Kitchen and Specialty Autos simply as "Kitchen" except where the distinction becomes relevant. Under this arrangement, Continental provided Kitchen up to $1 million in funds to finance Kitchen's car purchases, an office at its dealership location, clerical assistance, and certain insurance coverage on the vehicles. In return, Kitchen agreed to pay Continental a flat $200 fee per car purchased, plus an additional $100 that went into a reserve account. Kitchen was responsible for any repair or shipping expenses on the cars, as well as for repaying Continental's financing on each car, including accrued interest, when sold.[3] Any net profit

---

[2]  Kitchen had helped found and later judged the "Bloomington Gold" event, at which Corvettes are certified as to authenticity. He had also consulted with the publishers of the "Black Book" regarding market values of cars.

[3]  Continental's comptroller, Bill Henline, testified that Continental charged Kitchen a monthly interest rate equal to the rate the dealership itself was paying each month.

collected on each sale went to Kitchen, and he was permitted periodic draws against accumulated profits, but he also bore the risk of any losses.

Another important feature of Kitchen's floor-planning arrangement with Continental was that, in contrast to Taylor and Hendrix, title to cars Kitchen purchased with funds advanced by Continental were placed in Continental's name, and Continental kept the certificates of title in a locked fireproof safe at its offices. Kitchen testified that, as the vehicles were titled to Continental, he operated under Continental's dealer license.

Kitchen completed approximately 190 wholesale transactions during 1996.[4] Of these, less than ten of Kitchen's purchases and less than ten of his sales were with Taylor, and about half

---

[4] Kitchen described his work in the wholesale market for high-end specialty cars as involving the purchasing and selling of such cars between dealers and other wholesalers across the country. Unlike the retail market, the wholesale market, according to Kitchen, was "instant"—"there's not much deliberation on price." He described a typical transaction:

> [O]ne Mercedes dealer in a small town calls me and says he has an S55 . . . a very expensive car and a small dealership wouldn't want to keep it. But a large dealership in a metropolitan area like Dallas or Phoenix has a lot of use for those cars. So the smaller dealership would call me and say, "I have this car that came in on trade. I don't need it. What can you do with it?" So I would call a large metropolitan dealer and say, "This is the car they have. Do you want it? They would say, "Yes, we'll take it." At that point, it's a sold unit.
>
> . . . .
>
> At that point, I would make the purchase from . . . the small dealer. I would send him funds, pay for the car. They'd send me the title. I, in turn, would send the title to the purchaser of the car. And the large metropolitan dealer[] would send me funds. . . .

Kitchen added that, "most of the time, I would never see the car" because "the car would be shipped from point A to point B," saving freight costs. He also noted that in situations in which he had a buyer, it was a "very common practice" in the industry to ship the car to the buyer before he had received the title from the seller and transferred it to the buyer in exchange for payment.

of this group of transactions involved cars that Kitchen or Taylor bought and later sold back to the other. Several of the issues on appeal concern interests THPD claimed in four specific cars:

- *1965 Chevrolet Corvette.* Kitchen sold this car, then titled to Continental, to Taylor but later repossessed it for non-payment. Continental later sold the car. THPD claimed Taylor had, in fact, paid for the car, that title had passed to Taylor and that THPD thereby possessed a security interest in the car. THPD alleged that Kitchen and Continental's actions constituted conversion and theft.

- *1965 Mustang & 1982 Ferrari*. Taylor transferred these cars, in which THPD claimed a security interest, to Kitchen in response to Kitchen's attempts to collect the $50,000 purchase price of a 1994 Mercedes S420 that Kitchen had previously sold Taylor. Continental later sold both the Mustang and the Ferrari. THPD claimed that Continental took these cars subject to its security interest and that its actions constituted conversion.

- *1992 Chevrolet Corvette.* Hendrix testified that he financed $18,500 toward Taylor's purchase of this car on July 22, 1996. Taylor purchased the car on August 10. On September 11, Taylor sold the car to Kitchen (Continental) for $18,500. However, Kitchen did not take physical possession of the car until January 1997, after Auto Gallery had been shut down. Continental eventually sold the car. THPD claims that Continental had purchased the car subject to its security interest and that its actions constituted conversion.

In addition to its claims involving these four specific cars, THPD sought to hold Continental liable for all of the losses it incurred due to Taylor's fraudulent actions. Its core contention in this regard was that Kitchen and Taylor had an arrangement whereby Kitchen would buy cars from Taylor and, rather than taking physical possession, would leave the cars at Auto Gallery for Taylor to sell at retail—allegations, in other words, that Kitchen, with Continental funds, was in effect financing a portion of Taylor's inventory and benefitting from Taylor's sales of those cars. THPD pointed to the following transactions in support of its theory:

9

- **_1966 Dodge Coronet_**. Hendrix testified that this car was on the Auto Gallery lot not later than April 12, 1996, and that THPD later financed it. On April 12, Taylor sold the car to Kitchen (Continental) for $22,500. It is undisputed that Kitchen never took physical possession of the car. On May 13, Taylor bought back the car from Kitchen for $25,000. Taylor then sold it to a buyer in Florida.

- **_1993 Chevrolet Corvette_**. Hendrix testified that THPD financed $23,500 for Taylor's purchase of this car on May 6, 1996. Taylor sold the car on May 14 to Kitchen (Continental) for $22,000. On May 29, Taylor bought back the car from Kitchen for $22,750. On same day, Taylor sold it to another dealer for $22,000. Hendrix testified that he was unaware that Continental had owned the car between May 14 and May 29.

- **_1954 Jaguar_**. Hendrix claims that Taylor had this car listed as a consignment in April 1996. On June 8, Hendrix testified that Taylor induced him to finance $37,500 toward the purchase of the car from its owner, claiming that Taylor "probably had a deal up in Michigan." The car was trailered to Michigan in June, but no sale occurred. On August 29, Taylor sold the car to Continental for $35,000. However, the car remained in the Auto Gallery showroom through the dealership's closing in late December. Hendrix claims that while he understood Continental might be buying the car, he wasn't informed that the sale had been completed.[5]

- **_1992 Chevrolet Corvette_**. This is one of the four cars that was the subject of THPD's conversion claims. Hendrix claims that the car remained at Auto Gallery, mostly in the showroom, through the dealership's eventual closing in late December. Hendrix claims that Taylor never informed him that the car had been sold.

Hendrix claimed that Taylor offered these cars for retail sale at Auto Gallery even during the periods in which it turned out that Continental had title. THPD urged that Kitchen's and Taylor's actions constituted a violation by Continental of dealer regulations prohibiting off-site sales of cars

---

[5] The district court ultimately ruled that Taylor had never acquired ownership of the car and awarded it to the true owner, to the detriment of both THPD, which had been induced by Taylor to finance the car, and Continental, which had paid Taylor for the car.

without proper signage. *See* 16 Tex. Admin. Code § 111.10(2) (1995). It was undisputed that Kitchen did not personally sell any of the cars at Auto Gallery, that Taylor, not Kitchen, sold the 1966 Dodge Coronet and 1993 Chevrolet Corvette, and that Taylor had to repurchase the cars from Kitchen before conveying them to the ultimate buyers. However, THPD pointed to these "flips" of the cars back to Taylor as evidence of Kitchen's awareness that Taylor was selling Continental's cars at retail.

Kitchen, as well as Taylor, denied having any such arrangement. Kitchen further denied any knowledge that Taylor was actively attempting to sell the cars, explaining that he had assumed Taylor had simply received unsolicited inquiries. As for why he did not take possession of the cars immediately, Kitchen claimed that he simply had not had time to pick up the Dodge and 1993 Corvette before Taylor offered to buy them back. As for the two cars he left at Auto Gallery for more extended periods, Kitchen explained that he wanted to hold them for later sale, when he could get a better price.[6] He added that both cars required an indoor, secure location like Auto Gallery and that Taylor was agreeable to his leaving the cars—which were apparently viewed as a "draw" for customers—at Auto Gallery.

---

[6] Kitchen testified that with some of his wholesale purchases, he would not seek a buyer immediately but wait until market conditions for that particular car improved. He cited the example of convertibles, for which there tended to be stronger retail demand in the spring. For this reason, Kitchen "would buy convertibles in the fall and hold them until the spring market and the markup or the monies that I could make . . . was more than adequate to cover the interest" that would accrue in the meantime. The 1992 Corvette was a convertible. As for the 1954 Jaguar, Kitchen testified that he was planning to take it to an Arizona car auction the following spring. Kitchen added that he had seen the Jaguar on the Auto Gallery showroom floor in an area that "was roped off so no one could get to it and very secure." Hendrix didn't recall the Jaguar being in a roped-off area.

THPD attempted to link this alleged scheme to Taylor's fraud by contending that the presence of the cars at Auto Gallery led Hendrix to assume that the cars were part of THPD's collateral, thereby delaying his discovery of Taylor's wrongdoing. In fact, there was evidence that Taylor made affirmative misrepresentations to Hendrix that some of the cars titled to Continental were part of THPD's floor plan. Kitchen denied any knowledge of these misrepresentations, that he had any intent to harm Hendrix, or that Taylor had asked him to leave the cars at Auto Gallery for any reason. Taylor, in fact, denied that Kitchen knew of his wrongdoing.[7]

---

[7] THPD accused Kitchen and Continental of further harming it by providing "funds" or "financial assistance" to Taylor and Auto Gallery, which kept the dealership afloat, which, in turn, caused further loss of its collateral. As he had with others, Taylor had "bounced" a number of checks and drafts he had given Continental as payment for vehicle purchases. THPD complained that Continental, in essence, was too slow in collecting on those checks and drafts, enabling Taylor effectively to finance his operations from the float; it also attached significance to evidence that Continental would sometimes deviate from its standard policy of requiring payment by cashier's check if a check or draft had been returned unpaid twice. In some such cases, Continental presented Taylor's drafts for payment a third time or permitted him to pay with a personal check. According to THPD, this was proof that Continental was intentionally helping keep Taylor in business, thereby aiding his fraudulent activities. In response, Continental's witnesses and Kitchen observed that neither had financial incentives to delay collections—interest on their funds continued to run until they were collected and paid off, and Kitchen's sales would not yield net profits to fund his draws until the payments were collected. Continental also pointed to evidence of Kitchen's aggressive collection efforts regarding the 1994 Mercedes S420 and 1965 Corvette.

THPD also portrayed as suspicious a transaction in which Taylor had sold an Acura NSX to Continental for $60,000, transferring the title, and then repurchased the Acura on the following day for $61,000. The vehicle never left Auto Gallery. Kitchen testified that he had understood that Taylor had a retail buyer lined up for the car and needed the funds to purchase the car, and that the transaction was intended as a loan, secured by the vehicle title. According to Kitchen, once Taylor purchased the car, Taylor was to sell it to the retail buyer, collect payment, and pay Kitchen back, with an additional $1,000. Kitchen claimed that such transactions were not unusual in the industry. As it turned out, by the time of the transaction, the retail buyer had already paid Taylor for the car and taken delivery, and Taylor had held only the title. Kitchen testified that he had been unaware that the retail buyer had already paid for the car and taken delivery.

12

**Verdict and judgment**

The district court submitted multiple liability theories against both Taylor and Continental. The jury found that Taylor had committed fraud against Hendrix and THPD, that he had committed theft, that he had breached his fiduciary duty to THPD, and that he had transferred the 1965 Mustang and 1982 Ferrari (the cars that Taylor had traded to Kitchen when Kitchen was trying to collect on the 1994 Mercedes S420) with the intent to hinder THPD's security interests. The court further instructed the jury that Taylor had breached his contract with THPD and intentionally misapplied funds provided under his agreement with THPD or titles to vehicles financed by THPD, and submitted only the amount of damages under each theory. The jury awarded $277,794.97—the total amount THPD had attributed to its loss of collateral—on THPD's claims for fraud, breach of fiduciary duty, and misapplication of funds or titles. The jury awarded $35,208 for theft and just over $270,000 for breach of contract. The jury also found that Taylor had acted with malice and awarded $250,000 in exemplary damages.

The jury failed to find that Continental had knowingly participated in Taylor's breach of fiduciary duty, acted in concert with Taylor in misapplying funds or titles, aided or attempted to aid Taylor's misapplication of funds or titles, or aided or attempted to aid Taylor's theft. It also failed to find that Kitchen and Continental were engaged in a joint venture or that Kitchen was an employee of Continental, but found that Kitchen had been acting in furtherance of a mission for Continental's benefit and subject to its control. However, the jury found that Continental had committed theft, awarding $21,618 (which, the parties agree, reflects the value of the 1965 Corvette); committed constructive fraud, again awarding $21,618; and intentionally interfered with the contract

13

between Taylor and TBT and THPD, awarding $28,550.[8]  The jury also found that Continental converted all four of the vehicles made the basis for those claims and awarded damages corresponding to the sale prices Continental had received for each vehicle—$25,000 for the 1965 Corvette, $9,950 for the1965 Mustang, $19,500 for the 1982 Ferrari, and $18,600 for the 1992 Corvette.

The jury also found that the negligence of Taylor and TBT, Continental, and THPD and Hendrix had proximately caused THPD and Hendrix's damages, which it again determined to be $277,294.97.  It apportioned responsibility 85 percent to Taylor and TBT, 10 percent to THPD and Hendrix, and 5 percent to Continental.

Predicated on the jury's finding that Taylor had committed fraud, had committed theft, or that THPD had incurred damages from Taylor's misappropriation of funds or titles, the district court submitted an issue inquiring whether Continental was "part of a conspiracy that damaged THPD."  The jury found in the affirmative.  However, the charge did not request, and the jury did not find, any amount of damages that were proximately caused by the conspiracy.

The jury failed to find that Continental had acted with malice.  It made further findings regarding the amount of THPD and Continental's attorney's fees.

---

[8] This figure equals the sum of Continental's sale prices for the 1965 Mustang and the 1992 Corvette.  The jury heard evidence that Continental had been appointed receiver of these two cars and that, through what Continental maintains was an innocent mistake, its salespeople later sold both cars in violation of the receivership order.  That the sales may have violated the receivership order is ultimately irrelevant to our analysis, but we note it only to observe that the jury's award on THPD's intentional interference claim corresponds precisely to the combined sale prices of these two cars.

Following the verdict, the district court disregarded the jury's finding regarding a conspiracy between Taylor and Continental on the grounds that THPD failed to obtain a finding as to the amount of damages that the conspiracy had proximately caused. THPD elected to recover from Taylor and TBT for fraud, breach of contract, and breach of fiduciary duty. The district court awarded a lump sum of $277,794.97 in actual damages, the $250,000 in exemplary damages found by the jury, and attorney's fees. Against Continental, the district court awarded a lump sum of $83,932.00 based on THPD's claims for theft, conversion, and negligence. The court further rendered a declaratory judgment that THPD had a "superior security interest in and right of possession of" the 1965 Corvette, 1965 Mustang, 1982 Ferrari, and 1992 Corvette. It additionally awarded THPD $125,000 in attorney's fees and prejudgment interest.

Both THPD and Continental have appealed the judgment. Taylor and TBT have not appealed.

## DISCUSSION

THPD brings four issues, contending chiefly that the district court erred in disregarding the jury's finding that Continental was "part of a conspiracy that damaged THPD" and refusing to impose, based on that finding, joint and several liability against Continental for the entire amount of fraud damages awarded against Taylor, including exemplary damages and attorney's fees. In six issues, Continental challenges the sufficiency of the evidence supporting the jury's findings that it converted four cars and committed theft, contends that it owed no duty to Hendrix that could be the basis for negligence liability; argues that the district court's lump-sum damages award on

15

multiple liability theories violates the "one-satisfaction" rule; and asserts that the district court erred in granting declaratory relief and in awarding attorney's fees against it.[9]

**Conspiracy**

The district court disregarded the jury's finding regarding conspiracy on the ground that THPD had failed to obtain a finding of any damages that were proximately caused by it. THPD contends this ruling was error, emphasizing the general concepts that conspiracy is a derivative tort and that a co-conspirator may be held jointly and severally liable for the damages caused by the underlying tort. *See Akin v. Dahl*, 661 S.W.2d 917, 921-22 (Tex. 1983).[10] Continental responds that the district court did not err in disregarding the conspiracy finding on this ground. It also asserts cross-points contending that no evidence supported a submission for conspiracy and that the submission omitted the essential element of a "meeting of the minds," *see Chon Tri v. J.T.T.*, 162 S.W.3d 552, 560 (Tex. 2005), and that an adverse finding on that element must be deemed in support of the judgment because THPD neither objected to the omission, requested a question or instruction in substantially correct form, nor preserved that contention on appeal. *See* Tex. R. Civ. P. 278, 279. We agree with Continental that THPD's failure to obtain a jury finding of the damages caused by any conspiracy precludes its recovery under that theory and that the district

---

[9] In a cross-point, THPD asserts, without further elaboration, that "Continental waived error by repeatedly failing to cite the record when making factual assertions in its appellate brief." We overrule this cross-point.

[10] In what it terms a "cross-point" responding to Continental's issues, THPD observes that the district court's imposition of joint and several liability would render "moot" Continental's challenges to the damage awards against it.

court did not err in disregarding the "conspiracy" finding the jury made. Consequently, we need not reach Continental's cross-points.

The elements of civil conspiracy include (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). Proof of civil conspiracy requires proof of "damages as the proximate result" of the conspiracy. *Id.* "The gist of a civil conspiracy is the damage resulting from commission of a wrong which injures another, and not the conspiracy itself." *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex. 1968).

The charge inquired whether Continental was "part of a conspiracy that damaged THPD, Inc." The district court instructed the jury:

> To be part of a conspiracy, an employee, agent or representative of Continental Imports, Inc. and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to THPD, Inc. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

The jury was not asked, in this question or elsewhere, to find the amount of damages proximately caused by the conspiracy. Nor has THPD preserved a complaint regarding the omission of such an issue.

THPD suggests that, under the charge as submitted, the jury necessarily found that the damages caused by the "conspiracy" were the fraud damages it awarded against Taylor. THPD observes that the jury was instructed that a "conspiracy" must have "resulted in the damages to

17

THPD, Inc.," and that the issue had been predicated on a fraud finding against Taylor. There are several flaws in THPD's argument. First, the conspiracy submission was predicated on *any* of three *alternative* findings: (1) that Taylor had committed fraud, (2) that Taylor had committed theft, or (3) that damages had resulted from Taylor's misapplication of funds or titles. The jury awarded widely divergent damages against Taylor for these underlying torts—$277,794.97 for fraud and misapplication of funds, versus only $35,208 for theft.[11]

More importantly, even if Taylor's fraud was the sole tort underlying the finding, it does not automatically follow that whatever damages were caused by the fraud were also attributable to the "conspiracy" the jury found. This principle is illustrated by two cases on which Continental relies, *Belz v. Belz*, 667 S.W.2d 240 (Tex. App.—Dallas 1984, writ ref'd n.r.e.), and *Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002). *Belz* was an appeal of the trial court's division of a community estate. 667 S.W.2d at 242. The jury found that the husband had defrauded the wife and awarded damages against the husband for fraud. *Id.* The jury also found that the husband, along with the husband's brother and friend, had engaged in a conspiracy to defraud the wife of her community interest in the marital estate. *Id.* However, the jury found that the wife had sustained zero damages as a result of the conspiracy. Relying on the jury's fraud finding and damage award against the husband and the conspiracy liability finding against the two friends, the trial court imposed joint and several liability against all three defendants for the amount of the jury's fraud

---

[11] Although the jury did not make itemized findings regarding which cars' values were reflected in this damages award, we note that the amount corresponds to the sum of the values of the 1965 Mustang and 1982 Ferrari in Hendrix's damages model. These were the cars that Taylor traded to Kitchen in response to Kitchen's efforts to collect on the 1994 Mercedes S420.

18

damages award. *Id.* The Dallas Court of Appeals reversed, reasoning that "[a]s there were no findings of damages resulting from the conspiracy, there can be no judgment rendered against those accused of the conspiracy." *Id.* at 243. It added that because the wife "failed to prove an essential element of her cause of action for conspiracy to defraud, i.e. damages," there could be no judgment for joint and several liability. *Id.*

In *Bentley*, Bunton, the host of a local public-access television show, and Gates, a participant on the program, appealed a judgment based on a jury verdict that each had defamed Bentley, a judge, and conspired to defame him. *See Bunton v. Bentley*, 176 S.W.3d 1, 6 (Tex. App.—Tyler 1999), *aff'd in part and rev'd & remanded in part*, 94 S.W.3d 561 (Tex. 2002). The judgment awarded Bentley $7,150,000 in actual damages plus $1,000,000 in exemplary damages for Bunton's defamation but only $95,000 in actual damages plus $50,000 in exemplary damages for Gates's defamation. *Id.* While finding that Bunton and Gates had conspired with one another to defame Bentley, the jury was not asked to find the amount of damages attributable to the conspiracy, nor did the trial court impose joint liability on the co-conspirators. *Id.* at 16. Bunton and Gates appealed. Bentley brought a cross-point urging that, in light of the jury's conspiracy finding, Gates should have been held jointly and severally liable with Bunton for the full amount of damages the jury awarded against Bunton. *Id.* at 15. Of relevance here, the Tyler Court of Appeals reversed the trial court's award of damages against Gates for defamation but overruled Bentley's cross-point regarding joint liability based on the conspiracy finding. Relying on *Belz*, the court of appeals held that "[i]n order to be entitled to judgment for joint and several liability, Bentley was required to secure a jury finding on the amount of damages he suffered as a

19

result of the conspiracy itself." *Id.* at 17. It further observed that "[t]he damages found by the jury against Bunton were not appropriate as against Gates because many of the defamatory acts occurred prior to Gates's involvement in the . . . program." *Id.*

Both sides sought review in the Texas Supreme Court, with Bentley again raising his contention that the jury's conspiracy finding entitled him to judgment imposing joint and several liability against Gates for all of the damages the jury awarded against both defendants.[12] Seven of the eight justices participating joined in the judgment affirming the court of appeals' judgment that Bentley take nothing on his claims against Gates. 94 S.W.3d 561, 607 (Tex. 2002). Other than to acknowledge the court of appeals' holding regarding Gates's joint liability for conspiracy,[13] the supreme court did not explicitly analyze that issue. Nonetheless, in rendering judgment that Bentley take nothing against Gates, the supreme court necessarily rejected Bentley's contentions regarding joint liability for conspiracy and affirmed the court of appeals' holding. We further observe that Justice Baker, in dissent, advocated Bentley's view that, as co-conspirators, Bunton and Gates should have been held "jointly and severally liable for the total damages the jury found against each individual co-conspirator defendant." *Id.* at 608 (Baker, J., dissenting).

---

[12] *See* Petition for Review of Bascom W. Bentley, III., No. 00-0139, *Bentley v. Bunton* (filed Feb. 12, 2002), at v-vi.

[13] The supreme court described the court of appeals' holding as:

Bunton and Gates were not jointly liable as co-conspirators because Bentley did not request a jury finding on what damages were caused by the conspiracy itself and the evidence did not conclusively establish that all of the damages Bunton caused were attributable to the conspiracy, such as damages resulting from statements made before the conspiracy was formed and never ratified by Gates.

*Bentley v. Bunton*, 94 S.W.3d 561, 607 (Tex. 2002).

20

THPD questions whether "[t]he Texas Supreme Court in *Bentley v. Bunton . . .* misinterpreted the earlier *Belz* opinion," but we are bound, as always, to follow the high court's holding here.[14] THPD also attempts to distinguish *Bentley*. It refers to a statement by the supreme court, describing the court of appeals' holding, to the effect that "the evidence did not conclusively establish that all of the damages Bunton caused were attributable to the conspiracy, such as damages resulting from statements made before the conspiracy was formed and never ratified by Gates." *Id.* at 577. Citing this language, THPD suggests that *Bentley*'s reasoning turned on evidence from television videotapes that conclusively established exactly when the conspiracy began and that Gates had not participated in Bunton's defamatory conduct from the beginning. THPD observes that, by contrast, "there are no videotapes of the wrongful conduct in this case and thus no bright-line test for determining when Continental became involved in the conspiracy and the amount of damages that had already been incurred at that point." In suggesting that *Continental* had the burden of establishing conclusive evidence of when the conspiracy began and that Taylor's fraud damages were *not* also attributable to the purported conspiracy, THPD misconstrues *Bentley*.

The language in *Bentley* on which THPD relies merely reflects the principle that if a party seeking relief fails to submit any element of his affirmative claim to the jury, it waives that ground of recovery on appeal unless the evidence conclusively establishes it. *See Wilz v. Flournoy*, 228 S.W.3d 674, 676-77 (Tex. 2007); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d

---

[14] We also reject Hendrix's argument that the rationale of *Belz* is limited to its facts, which involved a jury finding of zero damages from the conspiracy. The controlling principle in *Belz* is that a finding of conspiracy liability does not *ipso facto* constitute a finding that the conspiracy resulted in whatever damages any co-conspirator is found to have caused. *Belz v. Belz*, 667 S.W.2d 240, 242-43 (Tex. App.—Dallas 1984, writ ref'd n.r.e.).

21

218, 222-23 (Tex. 1992) (citing Tex. R. Civ. P. 279). Because there was neither conclusive evidence that all of the damages caused by the underlying defamation were also attributable to the conspiracy, nor a jury finding to that effect, Bentley could not recover those damages against Gates as a co-conspirator. *See Bunton*, 176 S.W.3d at 17. Similarly, THPD cannot demonstrate that the evidence here conclusively establishes that all of the fraud damages the jury awarded against Taylor were proximately caused by the "conspiracy" involving Continental—or that any particular amount of damages were. To the contrary, there is evidence that Taylor's defrauding of Hendrix began long before Kitchen's transactions with Auto Gallery and that Kitchen and Continental had relatively little connection to Taylor's actions thereafter. In urging that the evidence provides no "bright-line test for determining when Continental became involved in the conspiracy," THPD acknowledges as much.

Because THPD did not obtain a jury finding regarding the damages, if any, that were proximately caused by a conspiracy between Taylor and Continental, the jury's verdict cannot support a judgment imposing liability against Continental for conspiracy, much less one holding Continental jointly and severally liable as a co-conspirator for all damages that the jury awarded against Taylor. Consequently, the district court did not err in disregarding the jury's finding on the conspiracy submission and declining to impose joint and several liability on Continental for damages awarded against Taylor.[15] We overrule THPD's issues.

---

[15] This holding also obviates THPD's third issue, in which it contends that Continental's joint and several liability for Taylor's fraud would not be subject to the jury's apportionment of responsibility based on THPD and Hendrix's comparative negligence. In any event, Continental concedes that the proportionate responsibility finding would apply only with regard to THPD's negligence claims.

22

**Conversion and theft**

In its second issue, Continental challenges the legal and factual sufficiency of the evidence supporting the jury's findings that it converted four cars. We sustain a legal sufficiency complaint if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827.

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). But more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.* We review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller*, 168 S.W.3d at 807.

When reviewing a challenge to the factual sufficiency of the evidence supporting a vital fact, we must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We should set aside the verdict only if the evidence that supports the jury

23

finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). But we may not merely substitute our judgment for that of the jury. *Pool*, 715 S.W.2d at 635. The jury remains the sole judge of witnesses' credibility and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

With both legal and factual sufficiency complaints, the starting point of our analysis—barring a preserved and valid complaint of charge error—is the charge actually submitted to the jury. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (legal sufficiency); *Jackson*, 116 S.W.3d at 762 (factual sufficiency).

In its submission of THPD's conversion claims against Continental, the district court requested the jury to make separate findings as to whether Continental had "converted" the 1965 Corvette, 1965 Mustang, 1982 Ferrari, and 1992 Corvette.[16] The court instructed the jury: "In order to find that Continental . . . converted such property, you must first find that THPD, Inc. owned such property or had a greater right of possession or control of such property." *See Smith v. Maximum Racing, Inc.*, 136 S.W.3d 337, 341 (Tex. App.—Austin 2004, no pet.). Assuming it made that determination, the jury was further instructed that "conversion can be the exercise of dominion and control over property by selling property without having the right to do so" and that conversion can include "taking possession of property unlawfully and without authority to the exclusion of another's rights." The jury found in the affirmative as to all four cars and found that the value of each car as of the date Continental converted it was $25,000 for the 1965 Corvette,

---

[16] The district court also submitted an issue regarding whether Continental had converted a trailer that Kitchen and Taylor claimed they had co-owned. The jury failed to find that Continental had converted the trailer, and THPD does not challenge that finding on appeal.

$9,950 for the 1965 Mustang, $19,500 for the 1982 Ferrari, and $18,600 for the 1992 Corvette. The district court rendered judgment in the amount of the jury awards for the 1965 Mustang, 1982 Ferrari, and 1992 Corvette.

As for the 1965 Corvette, the court awarded THPD a total of $25,000. $21,618 of this award was based on the jury's award of theft damages. The parties agree that the 1965 Corvette was the sole basis for the jury's findings that Continental had committed theft. The jury awarded THPD $21,618 in damages on that claim.[17] In an attempt to avoid a double recovery, the district court awarded THPD the full amount of the theft damages found by the jury ($21,618) plus the portion of the conversion damages for the 1965 Corvette that exceeded the amount of the theft damages ($25,000 - $21,618 = $3,382), for a total of $25,000.

Continental maintains that there is legally and factually insufficient evidence that THPD either owned or "had a greater right of possession" than Continental to any of the four cars. Continental's central contention is that it, not THPD, owned each car and had the sole right to possess the car. THPD responds that it held a security interest in each car that constituted "a greater right of possession" than any interest Continental might have had.

Continental does not dispute that THPD would have had a security interest, as between it and Taylor, in a car Taylor purchased with THPD's loans. However, it contends, as one of its principal arguments regarding all four cars, that there is no evidence that THPD ever perfected its security interests as against third parties by filing its financing statement with the

---

[17] This amount corresponds to the value THPD's damages model allocated to the 1965 Corvette.

25

secretary of state. *See* Tex. Bus. & Com. Code Ann. §§ 9.309(1) & cmt. 3 (West 2002 & Supp. 2007), 9.310 (West Supp. 2007), 9.311(d) (West 2002 & Supp. 2007). The problem with this argument, as Continental's counsel acknowledged during oral argument, is that a copy of THPD's file-stamped financing statement was admitted into evidence at trial.[18] Nonetheless, Continental urges that this document should be given no probative effect because it came in as an attachment to a pleading that, in turn, was one of forty-four attachments to the investigative report of DPS Sergeant Larry Kocurek, who had investigated Taylor and Auto Gallery. Over objection, the district court admitted Sgt. Kocurek's report into evidence without limitation, and neither party complains of that ruling on appeal.

Continental invokes the principle that neither pleadings nor attachments to pleadings are competent evidence. *See Laidlaw Waste Systems (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex. 1995); *Carr v. Central Music Co.*, 494 S.W.2d 280, 281 (Tex. Civ. App.—Austin 1973, no writ). While that is generally true, here the financing statement was "introduced into evidence in the course of trial" and, consequently, may be "considered as evidence." *Carr*, 494 S.W.2d at 281. We conclude there is evidence that THPD perfected any security interests it held in the four cars by filing a financing statement covering its collateral.[19] We turn now to arguments that are specific to each vehicle.

---

[18] The document identifies the debtor as "TBT, Inc., d/b/a Auto Gallery," the secured party as "THPD, Inc., d/b/a AG Auto," is signed by Taylor and Hendrix, and identifies "Vehicle Inventory, Cars, Trucks" as collateral.

[19] Because the financing statement was in evidence, we need not reach THPD's alternative argument that we should take judicial notice of its filing or its cross-point that the district court erred in excluding THPD's expert testimony regarding its security interests.

*1965 Corvette*

The 1965 Corvette was one of the cars that Continental had floor planned for Kitchen. Pursuant to that arrangement, previously described, the car was titled to Continental. In September 1996, Kitchen sold the car to Taylor. Taylor gave Kitchen a draft for $23,300 and took possession of the car. Physical possession of the title remained with Continental, however, and Kitchen later repossessed the car for non-payment. Hendrix testified that, in October, THPD financed $21,000 toward the car. THPD contends this loan gave rise to a security interest in the car that constitutes "a greater right of possession" than Continental had. For THPD to prevail on this theory, however, there must be legally and factually sufficient evidence that Taylor's draft funded such that title would pass from Continental to Taylor. *See Valley Stockyards Co. v. Kinsel*, 369 S.W.2d 19, 22 (Tex. 1963); *Meaders v. Biskamp*, 316 S.W.2d 75, 82 (Tex. 1958); *Wagal v. SI Diamond Tech., Inc.*, 998 S.W.2d 299, 300-01 (Tex. App.—Houston [1st Dist.] 1999, no pet.). Otherwise, Taylor could not have conveyed a security interest in the car to THPD. *See Arcadia Fin., Ltd. v. Southwest-Tex Leasing Co.*, 78 S.W.3d 619, 624-25 (Tex. App.—Austin 2002, pet. denied). Conversely, if Taylor's draft *did* fund and THPD acquired a security interest in the 1965 Corvette, there is no question that Kitchen "exercise[d] . . . dominion and control" over the car by selling it without having the right to do so or took possession "without authority" to the exclusion of THPD's interests, so as to support a finding of conversion under the charge as submitted.[20]

---

[20] In addition to the above arguments, Continental relies on a line of authorities to the effect that a conversion plaintiff must prove an "immediate" right to possession and that a lienholder has no such right until he forecloses. *See State v. First Interstate Bank of Texas, N.A.*, 880 S.W.2d 427, 429 (Tex. App.—Austin 1994, writ denied). However, Continental acknowledges authority that the rule is different where, as here, a security interest has been perfected.

Continental urges that there is legally and factually insufficient evidence that Taylor's draft was ever paid. Kitchen was the only witness who testified from personal knowledge regarding that issue. He recounted that he had repossessed the 1965 Corvette because "I didn't want to fight with not getting paid." He explained that he would not have taken this step unless Taylor's draft had been returned twice unpaid. Kitchen added that he had also asked Taylor for a cashier's check—Continental's standard policy after a draft was returned twice—but "he couldn't supply that so I just went and got my car."

As for Taylor, he testified that he did not remember paying for the car. Consistent with Taylor's draft not having been paid, Auto Gallery bank records in evidence do not show a check or draft payment in the amount of $23,300, nor any debit in that amount.

Continental's bank statements from the relevant time period were also in evidence. They reflect the following:

- A credit, dated September 13, 1996, for a deposit of $23,300.
- A debit for the same amount, dated October 2, for "ACH Debit Collection Items."
- A credit, dated October 9, for a deposit of $23,300.
- A debit for the same amount, dated November 20, that appears in the section of the statement for "check paid." Unlike most other entries in that section, no check number was indicated.

_Villa v. Alvarado State Bank_, 611 S.W.2d 483, 486-87 (Tex. Civ. App.—Waco 1981, no writ). In any event, the charge as submitted required THPD to prove only "_a greater_ right to possession." _See Golden Eagle Archery, Inc. v. Jackson_, 116 S.W.3d 757, 762 (Tex. 2003); _Osterberg v. Peca_, 12 S.W.3d 31, 55 (Tex. 2000). If the jury found on sufficient evidence that Taylor had paid for the car, Continental would no longer own the car and would have had no right to possess it, whether THPD had foreclosed or not. Conversely, as a secured creditor, THPD would have had the greater right to possession, which was all that the jury charge required. Consequently, Continental's challenge to the jury's finding that it converted the 1965 Corvette ultimately turns on whether there is sufficient evidence that payment had been made on Taylor's draft.

28

- A credit for $23,300, dated December 10, labeled "Misc. Credit."
- A debit for the same amount, dated December 12, for "ACH Debit Collection Items."

In sum, the statements reflected three credits for $23,300 and three debits for the same amount.

Continental also presented evidence regarding the drafting process it used to facilitate the exchange of funds and car titles. To summarize this process, when Continental received a draft in payment for a vehicle, it would present the draft for payment, along with the original certificate of title, at its bank, which would credit Continental's account. The bank would then send the draft and title to the buyer's bank, who would essentially serve as an escrow agent holding the vehicle's certificate of title pending the buyer's payment of the draft. Upon receipt of payment from the buyer, the bank would exchange the title certificate. If the buyer did not make payment, the bank would eventually return the title and unpaid draft to Continental's bank, which would then credit the draft amount. Continental would then either pick up the draft and certificate of title or instruct the bank to attempt the process again. If the draft came back a second time, Continental's standard policy was to require the purchaser to bring a cashier's check or other payment directly to Continental, although it would sometimes present the draft a third time or permit other forms of payment.

Continental followed this drafting process with Taylor's drafts. It was undisputed that, as of the time Auto Gallery was shut down, Continental still retained possession of the 1965 Corvette's original title certificate. In the context of its drafting process, Continental

emphasizes that the fact that it held the vehicle's title, as well as the transactions reflected in its bank statements, further established that Taylor never paid the draft.[21]

THPD acknowledges that "no one testified conclusively that Taylor had paid for the vehicle." Instead, it argues that the jury could have reasonably inferred from Continental's bank statements and related testimony that Taylor's draft had been paid. THPD emphasizes testimony by Continental's title clerk, Shelley Christian, to the effect that returned drafts were ordinarily reflected in its bank statements as debits for "collection items" or "charge back to account." Following the October 9 deposit for $23,300, a corresponding debit for "ACH Debit Collection Items" did not appear until December 12. Instead, on November 20, a $23,300 debit for "check paid" appears (though no check number was listed). Continental's comptroller, Bill Henline, testified without dispute that Continental did not have any checks outstanding in the amount of $23,300 during this period. Henline inferred that the November 20 entry "would have been the return draft. In other words, the charge-back is misquoted, miscategorized on the statement as a check paid instead of a, quote, 'other debit item.'" A "Misc. Credit" for $23,300 next appears on December 10, followed two days later by the "ACH Debit Collection Items" debit in the same amount. Henline opined that these entries reflected that, upon receiving the statement including the November 20 "check paid" entry, he would have called the bank to inquire as to whether the entry actually reflected the returned draft, and that the subsequent entries reflected the bank's correction of the error.

The bottom line, as Continental suggests, is that the bank statements show three credits for $23,300, each offset by corresponding debits. Although the bank statements do not

---

[21] Evidence of Continental's drafting process and that it was followed in Taylor's vehicle purchases is also probative of Kitchen's course of dealing with Taylor in regard to transfer of title.

explicitly identify the $23,300 entries as reflecting Taylor's draft, nor contain the underlying documentation, there is no evidence that the entries could have signified anything else.

THPD states that Continental comptroller Henline gave deposition testimony that was "inconsistent" with his trial testimony. The totality of this evidence, only briefly noted at trial, is that Henline made some sort of statement during his deposition (the record does not elaborate exactly what) expressing a belief that Taylor's draft had paid, but that he had not had access to Continental's bank statements at the time. Upon reviewing those records, Henline came to the firm view that Taylor's draft had "clearly" not been paid.[22] The jury did hear evidence that Henline, as Continental's comptroller, supervised the company's accounting, and that Continental's title clerk would ordinarily inform him about checks and drafts that had been returned unpaid twice, facts that might tend to support the inference that he would be in a position to know about Taylor's draft if it had been returned. However, without more regarding the nature of Henline's deposition testimony, we cannot conclude that the evidence at trial raises more than a scintilla or speculation that Taylor's draft was, in fact, paid.[23]

---

[22] In evidence was an affidavit from Henline that he signed approximately one year after his deposition. In it, he avers that "I have now reviewed the financial records and bank statements for Continental" and concluded that, consistent with his position at trial, "it is clear that Continental Imports was never paid for the 1965 Corvette." He adds, "At the time that I testified that the draft cleared, I did not have the bank statements in front of me."

[23] THPD also asserts in its brief that Kitchen "admitted during his deposition that the payment cleared and that there was no documentation to show that the draft had been returned." It cites an exchange between Kitchen and THPD's counsel at trial in which counsel was attempting to impeach Kitchen regarding his belief that Taylor's draft had cleared. Kitchen acknowledged that he had made the following statement during his deposition: "It says here that the draft was redeposited on 10-8 and I have—I have nothing that says that it was returned so it needs to be researched to see whether that—when it went out, what is the title work." Counsel then introduced into evidence what was represented to be a page from an exhibit at Kitchen's deposition. The exhibit consists of a

31

Because we conclude there is legally insufficient evidence that Taylor's draft was paid, we sustain Continental's second issue with regard to the 1965 Corvette. Also, because THPD's theft claim is similarly premised on Taylor's having paid the draft, we sustain Continental's first issue, which challenges the sufficiency of the evidence supporting the jury's finding that it committed theft.

### 1965 Mustang, 1982 Ferrari & 1992 Corvette

The remaining three cars for which THPD recovered conversion damages were each transferred by Taylor to Kitchen and Continental. In September 1996, as noted, Taylor bought a 1994 Mercedes S420 from Kitchen, paying with a $50,000 draft. Between September and November, Continental presented the draft three times, but the draft was returned each time unpaid. Although Continental still held the car's title, Taylor had already sold the car to a retail buyer, who had taken possession of the vehicle. After Taylor's draft was returned a third time, Kitchen testified, he began "aggressively trying to get payment for [the] car." Kitchen asked Taylor for a cashier's check or for the vehicle to be returned, but Taylor was unable to comply with either request. Kitchen then told Taylor that he would "take anything," and urged: "Pay me in some way. Give me

---

printed list of three cars, numbered 10-12, with each entry containing what appears to be some sort of summary of transactions involving the vehicles. Entry 10 is titled, "1965 Corvette." The accompanying summary, in relevant part, reflects "10/2/96 Draft Returned" and "10/8/96 Draft Redeposited (Cleared)." The origins of this document or who created it is never explained in the record, though Kitchen's testimony appears to be his interpretation of what the document signifies. Furthermore, the record reflects that Kitchen continued during his deposition, "This tells me that the draft did come back. It tells me someone doesn't have a copy of the fact that the draft came back. It tells me that, the best of my memory, the reason I went and picked up the car was because the draft was never honored so he never paid for it. He never received the title. . . . He didn't pay for the car so I went and got it." Without more, we cannot conclude that this testimony would have enabled a reasonable jury to find that Taylor's draft had been paid.

compensation for the $50,000." Kitchen eventually agreed to accept payment in the form of $15,000 cash, the 1965 Mustang (valued at $7,500), and the 1982 Ferrari (valued at $27,500). Although Taylor delivered the Ferrari to Kitchen before Auto Gallery closed, he did not transfer title. Conversely, while Taylor transferred title to the Mustang before Auto Gallery closed, the car remained on Auto Gallery's lot until Kitchen took possession of it in January.

The last car—the 1992 Corvette—was purchased by Kitchen from Taylor in September 1996. Kitchen paid for the car with an $18,500 check, which was paid, and the certificate of title was reassigned from Auto Gallery to Continental at that time. As noted, Kitchen left the car at Auto Gallery through the time the dealership closed, taking possession of it in January 1997, at the same time he took possession of the 1965 Mustang.

Continental argues that it owned all three cars and that there is legally and factually insufficient evidence that THPD had "a greater right to possession." It relies primarily on its contention that there is no evidence THPD perfected its security interests in the vehicles. We have already rejected that contention.

THPD's security interests in each of the three cars would have continued, all other things being equal, notwithstanding their transfer to Continental. *See* Tex. Bus. & Com. Code Ann. § 9.315(a) & cmt. 2 (West 2002). Continental asserts two grounds by which it could have avoided THPD's security interests in the cars. First, Continental argues that THPD "authorized the disposition free of the security interest." *Id.* § 9.315(a) ("a security interest . . . continues in collateral notwithstanding sale. . . or other disposition thereof unless the secured party authorized the disposition free of the security interest."). Second, Continental contends that it was a "buyer in the ordinary course of business" with respect to each car. *Id.* § 9.320(a) (West 2002) ("a buyer in

33

the ordinary course of business . . . takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence."). Both grounds are in the nature of defenses on which Continental had the burden of proof. *See Montgomery v. Fuquay-Mouser, Inc.*, 567 S.W.2d 268, 270 (Tex. Civ. App.—Amarillo 1978, no writ) (terming authorization of collateral disposition free of security interest a "defense"); *International Harvester Co. v. Glendenning*, 505 S.W.2d 320, 321 (Tex. Civ. App.—Dallas, no writ) (buyer in ordinary course of business was an "affirmative defense"); *see also In the Matter of Gary Aircraft Corp.*, 681 F.2d 365, 373 (5th Cir. 1982) (Texas law) ("The burden on this issue does rest with the party claiming the status of a buyer in the ordinary course of business"). At trial, Continental did not request a jury issue or instruction regarding either ground, but objected to the submission of THPD's conversion theory altogether, contending it was "not a proper fact question for the jury [but] a legal question that should be resolved by the court in light of relevant statutes." Consequently, we determine whether Continental has established, as a matter of law (i.e., conclusively), either that THPD had authorized Taylor to transfer each car free of its security interests or that Continental was a buyer in the ordinary course of business.

Turning first to the 1965 Mustang and 1982 Ferrari—the two cars that Taylor traded to Kitchen in connection with the 1994 Mercedes S420—the evidence is, at best, disputed whether THPD had authorized Taylor to trade cars in that manner free of its security interest. Continental relies on a brief exchange during Hendrix's cross-examination in which he was asked whether Taylor "had authority to trade your cars in your floor plan?" Hendrix responded, "At times, yes. He had the ability to trade them." As THPD points out, the security agreement imposed the

34

following limitations on Taylor's disposition of collateral and requirements for terminating

THPD's interest in it:

> 10.    Sale of Collateral and Disposition of Proceeds. The Debtor agrees not to sell or dispose of the Pledged Collateral, except that so long as the Debtor is not in default hereunder, the Debtor shall have the right to sell each item of Pledged Collateral in the regular course of the Debtor's business at a price not less than the minimum sales price therefor specified in the Schedule furnished by the Debtor to the Secured Party in which such item is identified. The Debtor agrees to hold the proceeds of each sale separate and apart from the Debtor's own property and not later than the next business day to pay the Secured Party in cash an amount equal to the minimum sales price. Upon payment (or so long as the Debtor is not in default hereunder, on payment of a like amount without any sale) the Secured Party's rights in said item of Pledged Collateral and in the proceeds of such sale shall terminate and any amount so paid to the Secured Party will be credited on the Debtor's liabilities to the Secured Party.

*See* Tex. Bus. & Com. Code Ann. § 9.315(a) & cmt. 2 (observing that disposition free of security interest may be authorized "in the agreement that contains the security agreement"). The parties dispute whether this security agreement provision permitted Taylor to trade cars in lieu of cash sales, but even if it did, this would not conclusively establish that THPD authorized Taylor to extinguish its security interests in the 1965 Mustang and 1982 Ferrari when transferring them as partial payment of his obligation for the 1994 Mercedes S320. The issues here begin with the agreement's limitation that Taylor was authorized to "sell" the collateral only "in the regular course of [his] business," and it is Taylor's timely payment of the "proceeds of each sale" (or equal cash amount) to THPD that causes its security interest to terminate. *See Associates Discount Corp. v. Rattan Chevrolet, Inc.*, 462 S.W.2d 546, 549-50 (Tex. 1970) (observing that, under the U.C.C., "[w]hether a sale is in ordinary course is a mixed question of law and fact, and that question cannot be resolved without

35

information concerning all the circumstances of the sale."). Considering the circumstances of the transaction, we cannot conclude that, as a matter of law, the transaction was a "sale" in the regular course of Taylor's business, as opposed to payment of a debt. *See Chrysler Credit Corp. v. Malone*, 502 S.W.2d 910, 912-14 (Tex. Civ. App.—Fort Worth 1973, no writ).

For similar reasons, we also conclude that Continental has not established as a matter of law that it was a buyer in the ordinary course of business. "Buyer in the ordinary course of business" is defined:

> A buyer in ordinary course of business means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices.

Tex. Bus. & Com. Code Ann. § 1.201(9) (West Supp. 2007). A buyer in the ordinary course of business, however, "does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt." *Id.* At a minimum, fact issues remain as to whether Taylor "sold" Continental the two cars in accordance with usual and customary practices. *See Malone*, 502 S.W.2d at 912-14.

As for the 1992 Corvette, we likewise conclude that the evidence regarding the circumstances of the vehicle's transfer presents fact issues as to whether the transfer was a sale in the regular or ordinary course of Taylor's business. These circumstances include the fact that Kitchen left the vehicle at Auto Gallery for several months rather than taking possession and testimony that it was being offered for sale there.

36

We overrule Continental's second issue with regard to the 1965 Mustang, 1982 Ferrari, and 1992 Corvette.

**Negligence**

As noted, the district court submitted the negligence of Continental, Taylor and TBT, and Hendrix and THPD. The jury found that the negligence of all three parties had been a proximate cause of THPD's damages and that those damages were $277,294.97, a figure that equaled the calculation in THPD's damages model for its total loss of collateral. The jury apportioned responsibility 85 percent to Taylor and TBT, 10 percent to Hendrix and THPD, and 5 percent to Continental. These findings against Continental resulted in a negligence damages award of $13,864.75. In an attempt to avoid a double-recovery, the district court sought to limit Continental's negligence damages only to the loss of collateral for which THPD had not been compensated under other theories of recovery. It subtracted from $277,294.97 the allocated values for the 1965 Corvette, 1965 Mustang, and 1982 Ferrari in its damages model—respectively, $21,618, $9,712, and $28,825, for a total of $60,155—to yield $217,139.97,[24] then applied the 5 percent proportionate responsibility finding to yield $10,857.

In its third issue, Continental contends that the district court erred in awarding THPD damages against it under a negligence theory. The elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach. *IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004).

---

[24] The 1992 Corvette had not been included in THPD's damages model.

Continental urges that, as a matter of law, it did not owe THPD or Hendrix a duty from which its negligence liability could be predicated.

"It is fundamental that the existence of a legally cognizable duty is a prerequisite to all tort liability." *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex. 1993). The existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). There is no general duty to act reasonably toward others. *Rocha v. Faltys*, 69 S.W.3d 315, 320-21 (Tex. App.—Austin 2002, no pet.) (observing that the question of how a reasonably prudent person would act under the same or similar circumstances, considering any reasonably foreseeable risks or probability of injury to others "is the test for determining when a duty has been breached, not the test for whether a duty exists."). Instead, THPD must plead and prove facts that would establish a specific duty on the part of Continental. *Id.* at 321.

On appeal, THPD principally relies on the duty to use reasonable care in supervising aspects of an independent contractor's work over which one retains control. *See Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 791-92 (Tex. 2006).[25] Specifically, THPD argues that Continental retained control over such things as "financial details of [Kitchen's] transactions" and his "buying and selling automobiles" and, therefore, owed a duty to use reasonable care in supervising those activities. However, as Continental points out, the supervisory control giving rise to such a duty "must relate to the activity that actually caused the injury, and grant the owner at least the power to direct the order in which work is to be done or the power to forbid it being done in an

---

[25] THPD does not challenge the jury's findings that Kitchen was an independent contractor of Continental, not an employee.

38

unsafe manner." *Id.* at 791 (quoting *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex.1999)). The injury-causing conduct made the basis for THPD's negligence damages is ultimately Kitchen's alleged wrongdoing in leaving cars titled to Continental at Auto Gallery. THPD claims the presence of these cars caused him to incorrectly assume or be misled by Taylor that the cars were in his floor plan, delaying Hendrix's discovery of Taylor's fraudulent conduct and further decreasing the available collateral.

As noted, THPD contended at trial that Kitchen and Taylor had conspired to permit Kitchen to conduct off-site sales for Continental without the required signage, in violation of dealer regulations. He points to the following regulation, as it appeared at relevant times:

> (2) Sign requirements.
>
> (A) A dealer shall display a conspicuous sign with letters at least six inches in height showing the name under which the dealer conducts business.
>
> (B) Such sign must be readable from the address listed on the application for the dealer license.

16 Tex. Admin. Code § 111.10(2). THPD urges that these claimed violations constituted negligence per se. Negligence per se is a common-law doctrine whereby a duty is imposed based on a standard of conduct in statute rather than the reasonably prudent person test. *Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997).

We need not decide whether Kitchen and Taylor's conduct actually constituted a violation of section 111.10(2) because that regulation does not give rise to a duty of Continental with respect to Hendrix or THPD. "The threshold questions in every negligence per se case are

39

whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent." *See Perry v. S.N.*, 973 S.W.2d 301, 305 (Tex. 1998). Section 111.10(2), as THPD's own expert in motor vehicle laws acknowledged, is aimed at protecting the car-buying public by ensuring that dealers are clearly identifiable to the customers to whom they sell. It corresponds to provisions in the transportation code governing dealership location requirements and dealers' general distinguishing numbers. *See* Tex. Transp. Code Ann. § 503.001 (West Supp. 2007). THPD, as a floor planner or investor in the dealership where the alleged violations occurred, does not fall within the class that section 111.10(2) was intended to protect, nor were its claimed injuries—the loss of his collateral—among those the regulation was designed to prevent. *See Perry*, 973 S.W.2d at 305. We conclude that Continental did not owe Hendrix or THPD a duty based on chapter 16, section 110.10(2) of the Texas Administrative Code.

THPD also suggests that Continental and Kitchen owed it a duty at common law to ensure that Kitchen promptly removed cars he had purchased from Auto Gallery lest Hendrix or THPD be confused or misled regarding which cars were in the floor plan. THPD does not point to any case where a court has recognized a negligence duty under circumstances similar to those here.[26] For that reason alone, we are hesitant, as an intermediate appellate court, to recognize such a novel duty here. *See Ex Parte Morales*, 212 S.W.3d 483, 488 (Tex. App.—Austin 2006, pet. ref'd);

---

[26] Such a duty would be akin to imposing liability on a consumer who purchases furniture or an appliance from a store, based on the consumer's failure to take immediate delivery of the purchase, lest one of the store's creditors be confused or misled by the store regarding the amount of any inventory that is collateral for its loan.

*Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 565 (Tex. App.—Austin 2004, no pet.).

Nor do we find any support for recognizing such a duty here.

The supreme court has explained the principles that govern the imposition of a common-law duty:

> In deciding whether to impose a commonlaw duty, this Court has applied the familiar factors identified in *Graff . . . Greater Houston Transportation Co. . . .* and *Otis Engineering Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983). The considerations include social, economic, and political questions and their application to the facts at hand. We have weighed the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. Also among the considerations are whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm.

*Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 182 (Tex. 2004) (quoting *Praesel v. Johnson*, 967 S.W.2d 391, 397-98 (Tex. 1998)). "Of all these factors," the court has stated, "foreseeability of the risk is the foremost and dominant consideration." *Greater Houston Transp. Co.*, 801 S.W.2d at 525. Foreseeability exists when the actor as a person of ordinary intelligence should have anticipated the dangers his negligent act creates for others. *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002).

Nothing in the record indicates that Kitchen's leaving four vehicles at Auto Gallery—two of which were promptly sold back to Taylor—created a foreseeable risk of harm to Hendrix and THPD. *Id.* at 454. Even if Kitchen had been aware that Hendrix or THPD was floor

41

planning Taylor,[27] we cannot conclude that Kitchen or Continental should have anticipated that THPD (or whoever might be financing Taylor) would somehow be harmed by the mere presence of those cars at Auto Gallery. The evidence established that floor planners ordinarily employed basic safeguards to verify the vehicles in their floor plan, such as requiring that vehicle titles be kept in the floor planner's possession, and regularly checking the title certificates against inventory. Although there was evidence that such precautions were not always foolproof, the prevalence of such practices in the industry made it highly unlikely that a floor planner would be so oblivious regarding their collateral that Kitchen or Continental should be charged with knowledge that merely leaving a few cars there could cause injury. *See also Greater Houston Transp. Co.*, 801 S.W.2d at 525 (generally there is no duty to control the conduct of others).

As between them, Hendrix and THPD had a superior knowledge, compared to Kitchen and Continental, regarding which cars were in his own floor plan and was in a much better position to guard against any risk of loss associated with Taylor's activities. *See Graff*, 858 S.W.2d at 921. The negligence duty that THPD seeks to impose on Kitchen and Continental would tend to undermine Hendrix's incentives to engage in the most effective means of protecting his interests and reducing the risk of loss. *See id.* at 921-22; *General Tel. Co. v. Bi-Co Pavers, Inc.*, 514 S.W.2d 168, 173-74 & n.4 (Tex. App.—Dallas 1974, no writ) (citing Calabresi & Hirschoff, *Toward a Test for Strict Liability in Torts*, 81 Yale L.J. 1055, 1060 (1972)) (discussing the concept of tort liability as a function of opportunity to avoid loss, noting that one "formulation of this principle is that the

---

[27] Kitchen testified that he had been unaware that Hendrix was floor planning Taylor and had instead assumed that one of Taylor's bank was. Hendrix claimed, however, that Taylor had introduced him to Kitchen as Taylor's floor planner.

test of liability is which party had the better opportunity to evaluate the risk of loss and the cost of avoiding it, and to act upon such a decision").

In light of these considerations, we conclude that Kitchen and Continental owed no common-law duty to Hendrix and THPD under the circumstances presented.[28] Because the absence of a duty negates an essential element of THPD's negligence claim, THPD cannot recover on that theory. We sustain Continental's third issue.

**One-satisfaction rule**

In its fourth issue, Continental argues that the district court erred in awarding THPD a lump-sum damage award based on theft, conversion, or negligence theories because it provided THPD overlapping or duplicative recoveries for the same injuries, violating the one-satisfaction rule. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 5 (Tex. 1991). Because we have held that THPD cannot recover under either its theft or negligence theories, this issue is moot. We overrule Continental's fourth issue.

**Declaratory relief & attorney's fees**

In its fifth issue, Continental argues that the district court erred in rendering a declaratory judgment that THPD "has superior security interest in and right of possession of the 1965 Chevrolet Corvette, 1965 Mustang, 1982 Ferrari, and 1992 Corvette that are the subject of this suit." According to Continental, the declaration was incorrect as a matter of law. We have already

---

[28] To the extent that THPD maintains that Kitchen and Continental owed him a common-law negligence duty related to its collections of Taylor's checks and drafts, or the mere fact that Kitchen engaged in business transactions with Taylor from which Taylor might have financially benefitted, we similarly conclude this contention is without merit.

43

sustained that contention with regard to the 1965 Corvette. Continental further relies on the rule that a declaratory judgment is unavailable where a party is seeking in the same action a different, enforceable remedy and the declaration would add nothing to what is already explicit or implicit in a final judgment providing that remedy. *See Hageman/Fritx, Byrne, Head & Harrison v. Luth*, 150 S.W.3d 617, 626-27 (Tex. App.–Austin 2004, no pet.). Specifically, Continental contends that the declaratory judgment was redundant of the relief THPD obtained in the judgment awarding damages on its conversion claims. *See id.* Consequently, Continental asserts, THPD's declaratory claim amounted to a mere vehicle for obtaining attorney's fees. *See id.* Relatedly, in its sixth issue, Continental maintains that there is no other basis by which THPD could recover attorney's fees against Continental in this case. We must agree with Continental's contentions.

Here, as discussed above, THPD's recovery of damages for conversion turned on the jury's findings that it had a "greater right of possession" to the four cars, due to its security interests, than Continental had. The declaration that appears in the district court's judgment states:

> The Court further finds that THPD, INC. is entitled to declaratory judgment and it is therefore ORDERED that THPD, INC. has superior security interest in and right to possession of the 1965 Chevrolet Corvette, 1965 Mustang, 1982 Ferrari, and 1992 Corvette that are the subject of this suit.

The declaration added nothing to the determinations that were already explicit or implicit in the judgment awarding conversion damages.

We acknowledge the district court's view, expressed during a hearing on entry of judgment, that the declaratory claim was "indispensable" to the litigation apart from THPD's tort claims. However, we cannot discern, at least from the record before us, how the declaration and

44

accompanying fee award could be permitted under Texas law. We further note that while THPD asserted its conversion claims as early as 1998, it did not add its declaratory claim regarding who had the greater right to the four vehicles until 2004. We are compelled to conclude that this declaration was error and that any award of attorney's fees based upon it was an abuse of discretion. *See id.* We accordingly sustain Continental's fifth issue. Likewise, as none of THPD's other claims on which it recovers can support an attorney's fee award, we sustain Continental's sixth issue.[29]

## CONCLUSION

We affirm the district court's refusal in its judgment to impose joint and several liability against Continental for damages awarded against Norm Taylor and TBT. We likewise affirm the judgment to the extent it awards damages based on Continental's conversion of the 1965 Mustang, 1982 Ferrari, or 1992 Corvette.[30] However, we reverse the judgment to the extent it awards THPD damages for the conversion of the 1965 Corvette, or for theft or negligence, and render judgment that THPD take nothing on these claims. We must also reverse the portions of the judgment awarding THPD declaratory relief and attorney's fees and render judgment that THPD take nothing on those claims.

---

[29] For the same reasons, we overrule THPD's cross-point urging that the amount of attorney's fees awarded against Continental should have been $191,821.

[30] The total of these damages, as found by the jury, is $48,050. Prejudgment interest on this amount, calculated based on the accrual date and interest rate the district court utilized, is $16,433.58.

45

_____

Bob Pemberton, Justice

Before Justices Pemberton, Waldrop, and B. A. Smith
  (Justice B. A. Smith Not Participating)

Affirmed in part; Reversed and Rendered in part

Filed:   July 18, 2008