**Affirmed as Modified in Part, Remittitur Suggested in Part, and Memorandum Opinion filed July 27, 2023.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-22-00197-CV

---

**ZHEN QIN, AKA NICK ZHEN QIN OR NICK QIN; ELINA QIN; RIVERSTONE TOURS, INC.; US-CHINA PROFESSIONAL TRANSPORTATION, INC; US-CHINA PROFESSIONAL TRAVEL & TOURS, INC. F/K/A CHINESE PROFESSIONAL TRAVEL & TOURS, INC.; US-CHINA PROFESSIONAL TOURS, INC. (NEW JERSEY); US-CHINA PROFESSIONAL TOURS (NY), LLC; ARENDELLE MANAGEMENT, INC., AND US-CHINA PROFESSIONAL TOURS, INC. (TEXAS), Appellants**

**V.**

**YUANYUAN YANG, Appellee**

---

**On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Cause No. 16-DCV-235702**

---

## MEMORANDUM OPINION

Appellee Yuanyuan Yang entered into an agreement with appellant Nick Qin to obtain a United States immigration visa in exchange for a $1 million investment

in the United States economy. After Qin used Yang's investment for purposes other than creating a business for her to obtain a U.S. visa, Yang sued Qin asserting claims of fraud, breach of contract, conversion, breach of fiduciary duty, money had and received, and conspiracy. Yang obtained favorable jury findings on all causes of action and elected to recover on her fraud claim, which provided the greatest recovery. Qin, his wife Elina Qin, and several businesses owned by Qin appeal the trial court's judgment raising multiple issues. We affirm the trial court's judgment of liability for fraud against Qin and his businesses. We reverse the judgment assessing fraud damages against Elina. Because the evidence is legally insufficient to support the total amount of consequential damages awarded for fraud, we suggest a remittitur to an amount supported by the evidence. If a remittitur of the unsupported damages is timely filed, we will modify the trial court's judgment in part and affirm as modified. If it is not, we will reverse the judgment as to the fraud claims and remand those claims for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.      Trial Testimony

In 1990 Congress created the Employment-Based Fifth Preference Visa (EB-5) classification to encourage foreign investment in the United States economy, and to create jobs in the U.S. Jennifer Mizulski, an immigration attorney, testified about the EB-5 immigration program at trial. The program requires a minimum investment for an area the size of Houston of $1 million. A petition under the EB-5 program takes between three and five and a half years to process. The EB-5 program has three components: (1) monetary investment used to (2) create a company that will (3) create at least ten new jobs.

The Code of Federal Regulations (CFR) requires a business plan as part of the initial EB-5 application. *See* 8 C.F.R. § 204.6 ("To show that a new commercial

2

enterprise will create not fewer than ten (10) full-time positions for qualifying employees, the petition must be accompanied by: . . . A copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired."). According to Mizulski, it is a violation of federal law to use EB-5 investment funds in a manner that differs from that set out in the business plan.

In 1995, appellant Nick Zhen Qin created a travel company in Atlanta called China Professional Tours (Tours-Atlanta). Qin expanded his travel company to California (Tours-Riverstone), New York (Tours-New York), New Jersey (Tours-New Jersey), and Houston (Tours-Texas). Qin solicited investors, primarily from China, to fund his expansion. Some of his investors participated in the EB-5 visa program. An attorney named Deacon Zhang helped the investors with their EB-5 applications.

Appellee, YuanYuan Yang, testified that she met Qin in November 2014 in Athens, Greece to discuss Yang's participation in the EB-5 visa program. Shuyang Wu is a friend of Yang's and the father of her two children. Wu traveled with Yang in 2014 to Greece to discuss Yang's participation in the EB-5 program. Qin told Yang he would use her investment to establish a new company, buy a building to be used for the business, and create ten new jobs in the U.S. Qin also told Yang that her company's profit margin would be 20 percent and she could obtain a U.S. visa within one year. Yang believed Qin's representations, and decided to invest $1 million with him. Over the course of two months Yang had $1 million transferred to Qin.[1] Qin

---

[1] Due to limitations on currency exchange by the Chinese government, the $1 million had to be split into $50,000 increments sent by twenty different people.

instructed Yang to work with Zhang, the immigration attorney, on the EB-5 application. Yang submitted her EB-5 visa application with Zhang's help.

In February 2015, Wu, who lived in the U.S., traveled to Los Angeles to meet with Qin and Zhang. Zhang presented a business plan for Yang's investment and promised the business would be run according to the plan. The company Qin created with Yang's investment was called US-China Professional Training and Consulting Company, Inc. (Training).

In exchange for her investment Yang received a stock certificate reflecting 90-percent ownership in Training. Yang subsequently asked Wu to obtain the company's financial statements and operation status. Yang wanted to learn about Training's operation status because Qin had not communicated anything about the company or its finances. After more than a year, in June 2016, Wu spoke with Qin and learned that the $1 million investment had been spent. Qin communicated to Yang, through Wu, that Yang would need to invest more money to allow Training and her EB-5 application to continue.

In September 2016, after Yang's unsuccessful attempts to obtain financial records, Yang filed suit. Up until that time Yang lived in China and had no way to interfere with the business or learn of its operation except through Qin.

In October 2016 Qin met with Wu and promised to return Yang's $1 million investment in two installments. Yang, who participated by phone, accepted Qin's offer, and agreed to withdraw the suit if Qin made the payments. Qin handwrote an agreement in which he stated that he agreed to return $500,000 to Yang before December 31, 2016, and the remaining $500,000 before the end of June 2017. Qin failed to make either payment. After Qin refused to repay Yang's investment, she withdrew her EB-5 application because she could not comply with the program. There was no way to create ten jobs through Training, and she "would not want to

4

cheat USCIS."[2]

In January 2017, as an attempt to "save [her] company," Yang called for a shareholders' meeting of Training. Yang gave Qin notice of the meeting, but Qin did not attend. As a 90-percent shareholder, Yang voted to remove Qin as the sole director of Training, and appointed herself as sole director, president, and secretary.

Qin testified that he owned several businesses in the U.S., several of which were created pursuant to the EB-5 program. Qin created two other businesses in Houston: Arendelle Group, a real-estate company, and US-China Professional Transportation, Inc. (Transportation). Qin created Transportation for the purpose of owning the other companies' vehicles. Qin intended to use Training as an entity to help Chinese citizens come to the U.S. and train in Houston's Medical Center and oil community. Despite having three separate entities in Houston, Qin testified he treated them as "just one business."

After receiving Yang's investment, Qin spent the money on vehicles and attempted to hire drivers for the vehicles. Qin admitted using Yang's investment to pay off car loans on cars owned by Transportation, another business. Qin asserted that Transportation was a subsidiary of Training, but could not produce documentation to establish the relationship.

Qin also used Yang's investment to purchase an "office condo," which he intended to use for all of his Houston businesses. Qin intended to buy the condominium in the name of one of the companies and allow the other company to lease it back. Qin admitted that he used Yang's investment to purchase the condominium, but titled it in Arendelle's name. Qin further admitted, "I should have

---

[2] The United States Citizen and Immigration Service (USCIS) has a fraud unit that conducts regular audits to ensure that the investment is being spent in the manner required by the EB-5 program.

purchased the condo only for the Training purpose for the EB-5 for the investment for the future." After learning he was in violation of the EB-5 program, Qin transferred the title to Training.

Qin admitted that he used Yang's money for other businesses and that he freely transferred funds between businesses. Transfers of money were made without formal loan agreements or interest charges. For example, Training paid a franchise fee to Tours-Atlanta despite the lack of any franchise agreement. When Qin purchased vehicles for the companies, he did not pay attention to which company was being placed on the title. Qin admitted that he used invoices for some companies but credited the accounts to other companies. Qin "supposed" that Training paid insurance for vehicles owned by Transportation, another entity. Qin also paid hospital charges for family members from Training's account, but had not reimbursed Training. Qin admitted using Yang's $1 million investment to buy a home for Wu and transfer $400,000 to Tours-Atlanta, another one of his businesses. A balance sheet for Training reflected expenses of just over $498,000. Qin was unable to explain where the remaining $502,000 was spent.

Professor Danielle Cheek, a certified fraud examiner, testified that she reviewed several of Training's documents including bank statements, stock certificates, and a business plan. Professor Cheek also reviewed QuickBooks files, which revealed that bookkeeping entries were not being made contemporaneously with expenditures, and funds were being commingled among different entities. The QuickBooks data entries reflected spikes in entries when corresponding court events happened such as Yang requesting records or entry of a temporary injunction. The implication was that bookkeeping entries were only made in response to events in Yang's suit against Qin.

Cheek also reviewed the business plan and testified that Yang's $1 million

investment was not spent according to the business plan. Qin promised the immigration attorney that he would spend Yang's investment according to the business plan, but he did not do so. Within six weeks of Yang's last transfer, $400,000 was transferred to the Tours-Atlanta account with no memo of a business purpose. Out of $270,000 designated as payroll expenses, $134,000 was shown to be distributed to Qin or his daughter. Payments on a Sprinter van purchased in another company's name (Transportation) were debited to Training's account. Of all these expenses, the payroll expense was the only one included in the business plan. Training's account was used to make a $598,000 purchase, which was originally routed through an account called "Atlanta 8086," but was actually used to buy a house for Wu. By January 2017, Training's bank accounts had been depleted to between $5,000 and $10,000.

Through her investigation Cheek saw evidence that Qin used Training's funds for his personal gain and for his other companies' gain. As an example, Cheek testified that Qin used Training's funds to purchase his daughter's health insurance. Cheek's investigation revealed several transactions from Training's account that were simply movement of funds between Qin's businesses. Qin's other businesses were complicit in the misappropriation of Yang's investment.

## B.      Directed Verdict on Declaratory Judgment

Before the charge was submitted to the jury Yang moved for directed verdict on her declaratory judgment. In addition to her claims for damages Yang sought declaratory judgment declaring that she was sole director, president, and secretary of Training, and was entitled to sole possession of Training's corporate records as well as Training's assets. Yang asserted that she complied with the shareholders' agreement in calling a shareholders' meeting in January 2017, and there was no evidence to the contrary. Yang presented evidence that the meeting was held, and

that Qin was given notice of the meeting. Qin admitted in his testimony that he received notice of the shareholders' meeting but chose not to attend. The trial court granted Yang's motion for directed verdict on the declaratory judgment.

## C.    The Jury's Liability Findings

Yang sued Qin, his wife, Elina, and Qin's businesses asserting claims against Qin for breach of the settlement agreement, breach of contract, promissory estoppel, fraudulent inducement, fraudulent misrepresentation, and breach of fiduciary duty. Yang also asserted claims against all defendants for conversion, unjust enrichment, money had and received, and civil conspiracy. Yang asserted a claim of tortious interference with a contract against Qin's entities. After a multi-day trial, the issues were submitted to the jury through a lengthy and complex charge.

The jury found in Yang's favor on all claims[3]. The jury found that Qin agreed to pay Yang two $500,000 payments in exchange for her dropping the suit, and that Qin failed to comply with the settlement agreement. As to the breach of contract, the jury found that Qin and Yang agreed that Qin would invest Yang's funds in a new business venture for the purpose of Yang's EB-5 immigration visa, and that Qin breached the agreement by failing to use those funds in accordance with the business plan. The jury further found that Qin committed fraud against Yang, and fraudulently induced her to enter into the agreement in which she invested $1 million. As to conspiracy, the jury found that Qin and his business entities (Riverstone, Tours-Atlanta, Transportation, Arendelle, Tours-New York, and Tours-New Jersey, collectively "the Entities") conspired to damage Yang. Finally, the jury found that the harm to Yang resulted from malice or fraud.

---

[3] We detail only those findings necessary to the discussion of this opinion.

8

## D. The Jury's Damage Findings

On the fraud claim the jury was asked two questions on damages. The first question instructed the jury to consider the difference between the value of the funds Yang parted with and the value actually received, to which the jury answered, $1 million. The jury was also asked to determine Yang's economic damages that, in reasonable probability would be sustained in the future, to which the jury answered, $850,000.

The jury further found $150,000 in exemplary damages should be assessed against Qin, and $21,428 each against the Entities.

## E. The Trial Court's Judgment

The trial court rendered judgment for Yang against Qin, Elina, Riverstone, Tours-Atlanta, Transportation, Arendelle Group, Arendelle Management, Tours-New York, and Tours-New Jersey. The court awarded $1,850,000 in actual damages jointly and severally on Yang's fraud claims against Qin, Elina, and the Entities. The trial court awarded a total of $299,996 in exemplary damages including $150,000 against Qin, and $21,428 each against the Entities.

In addition to the monetary recovery, pursuant to the court's directed verdict on Yang's declaratory judgment, the trial court granted Yang a constructive trust over all right, title, and interest of the defendants in and to the property of Training, including (1) a 2016 Mercedes-Benz Metris van; (2) a 2010 Volkswagen Routan; and (3) the Riverside Office Condominium.

Qin, Elina, and the Entities appealed the trial court's judgment.

## II. STANDING

In Qin's eighteenth issue, and the Entities' thirteenth issue appellants challenge the trial court's partial summary judgment on the issue of standing.

9

Appellants do not challenge the trial court's partial summary judgment on any other affirmative defenses.

Yang filed a no-evidence motion for summary judgment seeking dismissal of all of appellants' affirmative defenses, including standing. and breach-of-contract claims. In Yang's reply, as to standing, Yang asserted that Qin's fraud was perpetrated on her, not on Training, and Qin entered into a settlement agreement with her, not Training. The trial court granted partial summary judgment on the issue of standing.

Qin and the Entities challenge the portion of the trial court's summary judgment order that found Yang had standing and capacity to pursue her claims of conversion, breach of fiduciary duty, unjust enrichment, money had and received, and conspiracy. We therefore limit our review of the summary judgment to appellants' claim that Yang lacked standing or capacity to assert claims in her individual capacity for conspiracy. Appellants did not claim Yang lacked standing or capacity to assert a claim of fraud.

A no-evidence summary-judgment motion serves the same function as a motion for pretrial directed verdict: it points out that there is no evidence of one or more essential elements of a claim or defense on which the nonmovant bears the burden of proof. *See* Tex. R. Civ. P. 166a(i); *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). To defeat such a motion, the nonmovant must present evidence raising a genuine issue of material fact supporting each element contested in the motion. *Timpte Ind.*, 286 S.W.3d at 310 (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006)). On appeal, we "review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless

reasonable jurors could not." *Mack Trucks*, 206 S.W.3d at 582 (citing *City of Keller*, 168 S.W.3d at 827); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 208 (Tex. 2002). We will affirm a no-evidence summary judgment when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *See City of Keller*, 168 S.W.3d at 816.

The trial court did not award damages based on Yang's conversion, breach of fiduciary duty, unjust enrichment, or money had and received claims. For that reason, we limit our analysis to appellants' contention that Yang lacked standing or capacity to assert a conspiracy claim in her own name. Appellants alleged that the conspiracy claim belonged to Training, not to Yang individually. Because conspiracy is a derivative tort, we look to Yang's standing to bring her fraud claim as an individual to determine whether Yang had standing to assert her conspiracy claim. *See Buzbee v. Clear Channel Outdoor*, LLC, 616 S.W.3d 14, 24 (Tex. App.— Houston [14th Dist.] 2020, no pet.) (holding that plaintiff had standing to assert civil conspiracy claim because he had standing to assert alleged Election Code violations on which the conspiracy claim was based).

In asserting affirmative defenses appellants did not challenge Yang's standing to assert fraud claims. Because appellants did not challenge Yang's jurisdictional facts to support standing for fraud, we hold Yang had standing to assert conspiracy. *See id*. To the extent appellants challenge the trial court's partial summary judgment on Yang's standing and capacity to assert a claim of conspiracy, we overrule Qin's eighteenth issue and the Entities' thirteenth issue.

## III. FRAUD

In issue one Qin and the Entities assert the trial court erred in entering judgment on Yang's fraud claims because Yang elected to enforce performance of, rather than to rescind, the settlement agreement. In issues six and seven Qin challenges the legal and factual sufficiency of the evidence to support the jury's findings of fraud. In issue eight Qin challenges the jury's findings of fraud based on a contract that was not admitted into evidence. In issue nine, Qin contends Yang's fraud claims are barred by section 21.223 of the Texas Business Organizations Code. In issue ten Qin challenges the legal and factual sufficiency of the evidence to support the jury's findings on damages for fraud.

### A.  The jury's findings that there was a valid settlement agreement do not preclude recovery for fraud.

Appellants assert that because the jury found the settlement agreement was valid, the jury necessarily found that all other claims by Yang were released. The jury made no such finding. The jury found that the parties entered into a settlement agreement and that Qin breached the agreement. In that regard, the jury found in Yang's favor on a breach-of-contract claim. When a party receives favorable jury findings on two or more theories of recovery that yield different damage amounts, that party may elect the measure of damage upon which the party wishes to recover. *See Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987). In this case, Yang elected to recover on her fraud claims rather than the breach-of-contract claims. The fact that Qin breached a settlement agreement does not affect Yang's right to elect the greatest recovery. Contrary to appellants' argument, Yang's claims were not released by the settlement agreement because Qin breached the agreement. We overrule appellants' first issue.[4]

---

[4] In issue two Qin and the Entities assert that Yang failed to prove damages under the

**B.** **The evidence is legally and factually sufficient to support the jury's findings of fraud.**

**1.** **Standard of Review and Applicable Law**

Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering any undisputed or conclusive contrary evidence, a reasonable factfinder could find the challenged fact to be true. *See Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016). Evidence of a vital fact's existence is legally insufficient if (a) no evidence in the record supports it, (b) rules of law or of evidence bar the court from giving weight to the only evidence offered to prove it; (c) there is no more than a scintilla of supporting evidence, or (d) the evidence conclusively establishes the converse. *See id.* at 613. When reviewing for factual sufficiency, we consider and weigh all of the pertinent evidence, and we will set the finding aside only if "the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered." *Id*. at 615. Whether reviewing the evidence for legal or for factual sufficiency, we defer to the jury's reasonable credibility determinations. *See City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005); *Noble Drilling (US) LLC v. Deaver*, 596 S.W.3d 482, 487 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

The jury was charged that fraud occurs (1) when a party makes a material misrepresentation, (2) the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, (3) the misrepresentation is made with the intention that it should be acted on by the other party, and (4) the other party justifiably relies on the misrepresentation and

---

settlement agreement. Having overruled appellants' first issue we need not address their second issue.

13

thereby suffers injury. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990). "Misrepresentation" was defined in the charge to include:

- A false statement of fact; or
- A promise of future performance made with an intent, at the time the promise was made, not to perform as promised; or
- A statement of opinion based on a false statement of fact; or
- A statement of opinion that the maker knows to be false; or
- An expression of opinion that is false, made by one who has, or purports to have, special knowledge of the subject matter of the opinion.

The jury was further instructed that "'Special knowledge' means knowledge or information superior to that possessed by the other party and to which the other party did not have equal access." We measure the sufficiency of the evidence against these instructions, to which there was no objection. *See JJJJ Walker, LLC v. Yollick*, 447 S.W.3d 453, 459–60 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

## 2. Qin represented that he would create a business for Yang that would comply with the EB-5 visa application program.

A material representation is one that a reasonable person would attach importance to and would be induced to act on in determining her choice of actions in the transaction in question. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). When Qin met with Yang in Greece, Qin told Yang he would use her investment to establish a new business, buy a building to be used for the business, and create ten new jobs in the U.S. Qin further represented that the new business would comply with the U.S. EB-5 visa program, and would enable Yang to obtain a visa to emigrate with her children to the U.S. Qin further represented that the business's profit margin would be twenty percent. Based on Qin's representations Yang entered into an agreement with Qin to transfer $1

million in exchange for his creation of a business that would comply with the EB-5 program.

Qin does not dispute having made these representations, but argues there is no evidence that the representations were false.

### 3. Legally and factually sufficient evidence supports the jury's finding that Qin's representations were false, and he did not intend to comply with his agreement with Yang.

Evidence of the actions taken by Qin after receiving Yang's $1 million is legally and factually sufficient to support the finding that Qin never intended to use Yang's investment to create a new company that would create ten new jobs. In fact, Qin admitted using Yang's investment to purchase a home for Wu, aid his other businesses, including Tours-Atlanta and Arendelle, pay himself a salary, and pay health costs for his daughter. None of these expenditures included those Qin represented as expenditures he would make on behalf of Yang's business.

The record further reflects that Qin did not follow the business plan that accompanied Yang's EB-5 application. The business plan, which was filed as part of the EB-5 application, stated that Training was owned by Yang and Tours-Texas, with Yang owning a 90-percent interest, and Tours-Texas owning ten percent. The plan noted that a majority of Yang's funds would be used to purchase approximately six Mercedes-Benz vans to transport "high-end business travelers to visit and study different locations in the U.S. for the potential business opportunities." The business plan stated that Training would hire three employees for "startup sales, operations, and administrative needs over [the] first few months." By the end of the first year it was projected that Training would have hired seven full-time employees.

The record reflects that Qin told Zhang he would spend Yang's investment according to the business plan. The record further reflects Training purchased only

two vans, paid for a condominium that it did not own, transferred $400,000 to another one of Qin's businesses, and paid for Wu's home.

Qin admitted knowledge of all of these transactions. He attempted to excuse the transactions by testifying that he treated all of his businesses as one large entity and that he freely transferred funds between businesses. Transfers of money were made without formal loan agreements or interest charges, and were not re-paid.

Qin admitted that he purchased the business condominium with Training's funds but titled it in Arendelle's name, then made lease payments from Training's account to Arendelle. Qin admitted that he planned this purchase even before receiving all of Yang's transfers of funds:

> Q. Now, three days after the money hits the bank account, you spent $207,963.63 to purchase the Riverstone condo, correct?
>
> A. Yes. That's the closing date. Maybe that is the closing date.
>
> Q. Yeah. So this was in the works even before Ms. Yang sent her money, right?
>
> A. Yeah, investment was planned when we know money was coming.

Qin asserts on appeal that he did not intend to make false misrepresentations, but was, at worst, negligent. Direct proof of intent to defraud is rare, but breach of the contract coupled with slight circumstantial evidence of fraud is sufficient to support a fraud finding. *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009); *see also Gotham Ins. Co. v. Warren E & P, Inc.*, 455 S.W.3d 558, 565 n.15 (Tex. 2014) ("Regarding whether the representation was fraudulent, this is an inquiry typically left to the jury as it often involves proof of intent by circumstantial evidence."). Although intent is determined at the time the representation is made, it may be inferred from the party's subsequent acts. *Aquaplex*, 297 S.W.3d at 775; *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). A promise of future performance constitutes an actionable

misrepresentation if the promise was made with no intention of performing at the time it was made. *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).

Considering the evidence recited above, the jury reasonably could have concluded that Qin never intended to comply with the business plan or the agreement he made with Yang. The record reflects that Qin used Yang's investment to enrich his other businesses, not on the promised business for Yang, which would have complied with the EB-5 program.

### 4. Legally and factually sufficient evidence supports the jury's finding that Yang relied on Qin's misrepresentations.

Fraud also requires that the plaintiff show actual and justifiable reliance. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). The plaintiff must prove that based on the alleged misrepresentation, she either took an action or failed to take an action, which caused her harm. *O & B Farms, Inc. v. Black*, 300 S.W.3d 418, 421 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

Yang testified that during her meeting with Qin in Greece she believed Qin "was truthful" when he told her he would establish a new company, buy a business building, and create ten new jobs. She further believed his representation that the profit margin would be twenty percent and her children could emigrate to the U.S. to study. Yang testified she "placed tremendous trust" in Qin. Based on Qin's representations that she would receive a U.S. visa through a program where her investment would be used to start a new business capable of supporting ten new jobs in the U.S., Yang transferred $1 million to Qin. Yang suffered harm from Qin's misrepresentations in that Qin spent her $1 million on a business condominium for another one of his businesses, a home for Wu, cash disbursement to another of Qin's

17

businesses, several vehicles for his other businesses, and salaries to himself and family members. Qin's actions risked rejection of Yang's EB-5 application for fraud.

Qin asserts that Yang could not have relied on his oral representations because the representations were contradicted by an express, written agreement. The written agreement to which Qin refers is the "Agreement on Investment/Immigration and Cooperation" (Training Agreement), which was excluded from evidence. When we review sufficiency of the evidence to support a jury's findings, we analyze whether the evidence *at trial* would have enabled reasonable and fair-minded people to reach the verdict that is under review. *Brazos Contractors Dev., Inc. v. Jefferson*, 596 S.W.3d 291, 307 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). We cannot review the jury's finding based on evidence that was not admitted before the jury.[5]

Qin further asserts Yang could not have justifiably relied on representations contained in the business plan to make her investment because the business plan was prepared months after she made the investment. However, the evidence supports a finding of detrimental reliance without reference to reliance on the business plan. Moreover, the business plan recorded the representations made by Qin in his meeting with Yang. Qin represented himself to Yang as an expert on EB-5 visa applications, which require a business plan. The jury reasonably could have concluded that Yang relied on Qin's representations when she agreed to invest $1 million.

Viewing all the evidence in the light most favorable to the jury's findings of fraud and considering any undisputed or conclusive contrary evidence, we conclude a reasonable jury could have concluded that Qin engaged in fraud. Considering all of the evidence, we cannot say that the credible evidence supporting the jury's findings is so weak, or so contrary to the overwhelming weight of all the evidence,

---

[5] Qin challenges the trial court's ruling excluding the Training Agreement, which we review below.

that the answers should be set aside. Concluding that legally and factually sufficient evidence support the jury's fraud findings, we overrule Qin's issues six, seven, and eight.

**C.    The evidence is legally and factually sufficient to support most of the damages found by the jury to be attributable to Qin's fraud.**

In Qin's tenth issue he challenges the jury's findings of damages for fraud. The trial court awarded Yang $1,850,000 in fraud damages. This award was based on the jury's answers to Questions 11 and 12 in the court's charge. In Question 11 the jury was asked, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Yang for her damages, if any, that resulted from Qin's fraud?" The jury was given two choices under Question 11 as to the measure of damages:

> a.    The difference between the value of the funds Yang parted with and the value actually received.
>
> b.    The difference between the value as represented to Yang and the value received.

The jury answered "$1,000,000" to each portion of Question 11. In Question 12 the jury was asked to consider "Yang's economic damages that, in reasonable probability, will be sustained in the future." The jury answered, "$850,000."

In Qin's brief on appeal, he asserts (1) the $850,000 is speculative and not a recognized measure of damages; and (2) the $1 million award is flawed because Yang still owns Training.

Actual damages for fraud may be either direct or consequential. *J & D Towing, LLC v. Am. Alternative Ins. Corp.*, 478 S.W.3d 649, 655 (Tex. 2016). Direct damages compensate for a loss that is the necessary and usual result of the tortious act. *Id*. By contrast, consequential damages, also known as special damages,

19

compensate for a loss that results naturally, but not necessarily, from the tortious act. *Id*. In Question 11, the jury was asked about damages that directly resulted from Qin's fraud. In Question 12, the jury was asked about consequential damages. We first address the jury's findings under Question 11 attributing $1 million in direct damages.

### 1. Direct Damages

Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure. *Formosa Plastics*, 960 S.W.2d at 49. The out-of-pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received. *Id*. Out-of-pocket damages "derive from a restitutionary theory," while benefit-of-the-bargain damages "derive from an expectancy theory." *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007).

The jury was instructed on both out-of-pocket and benefit-of-the-bargain measures of damages. We will address the benefit-of-the-bargain standard. Under this measure of damages, the defrauded party may recover the value of what she would have received if the bargain actually struck had been performed as promised. *See Formosa Plastics*, 960 S.W.2d at 50.

The record reflects that Yang invested $1 million in exchange for a promise of a visa under the EB-5 program. Mizulski, Yang's expert, testified that the EB-5 program required a minimum $1 million investment, a new business, and the creation of ten new jobs. She further testified that the CFR requires the filing of a business plan explaining how the business will spend money and create ten new jobs. The CFR requires a timetable for creation of the jobs and financial projections for two years. Mizulski reviewed the business plan submitted and testified that by

20

diverting Yang's investment to the Entities and himself, Qin failed to comply with the plan, which violated federal law. Mizulski further testified that if an investor's funds are not used as represented to the U.S. government, the EB-5 visa will be denied.

The evidence supports the jury's finding of $1 million in direct damages because Qin represented to Yang that if she invested $1 million she would obtain a visa under the EB-5 program. Due to Qin's misuse of Yang's investment, he did not comply with the law governing the EB-5 program, and Yang did not receive the visa for which she had bargained.

Qin asserts, however, that Yang received a benefit for her investment because the trial court awarded Yang a constructive trust in the assets of Training. The portion of the trial court's judgment that awarded Yang a constructive trust in two vehicles and the "business condo" was in addition to the monetary recovery found by the jury and was the result of the court's directed verdict on Yang's declaratory judgment action. Yang sought declaratory judgment that, pursuant to the Texas Business Organizations Code, and the actions taken at the January 19, 2017 Special Meeting of the Shareholders of Training, she was entitled to immediate and exclusive possession and control of Training's original corporate records and documents, together with Training's tangible and intangible assets.

The trial court granted directed verdict on Yang's declaratory judgment and awarded a constructive trust in Training's assets. On appeal Qin has not challenged the trial court's grant of directed verdict on Yang's declaratory judgment other than to contend that the grant of a constructive trust amounted to double recovery for fraud.

As to Qin's "double recovery" argument asserting that the monetary recovery should be offset by the assets Yang received, there was no evidence presented at trial

21

on the value of the assets. The right of offset is an affirmative defense. *Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980); *Wheelbarger v. Landing Council of Co-Owners*, 471 S.W.3d 875, 891 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). The burden of pleading offset and of proving facts necessary to support it are on the party making the assertion. *Brown*, 601 S.W.2d at 936.

In this case, Qin asserted as an affirmative defense that Yang's claims for damages were "barred, in whole or in part, by setoff and recoupment." Yang filed a motion for no-evidence summary judgment alleging that Qin failed to present evidence of his affirmative defenses. The trial court granted Yang's motion for no-evidence summary on several affirmative defenses including "setoff and recoupment." On appeal Qin has not challenged that portion of the trial court's summary judgment. Even if we determined Qin properly pleaded offset, Qin must have proved facts necessary to support an offset of damages. Here, there is no evidence of the value of Training's assets; therefore Qin's claim of offset fails.

Viewing all the evidence in the light most favorable to the jury's findings of direct damages for fraud and considering any undisputed or conclusive contrary evidence, we conclude a reasonable jury could have concluded that Yang's damages were $1 million. Considering all the evidence, we cannot say that the credible evidence supporting the jury's findings is so weak, or so contrary to the overwhelming weight of all the evidence, that the answers should be set aside. We conclude the evidence is legally and factually sufficient to support the jury's award of direct benefit-of-the-bargain damages for fraud. We overrule that portion of Qin's tenth issue that challenges the legal and factual sufficiency of the evidence to support the jury's finding of $1 million in direct damages.

### 2. Consequential Damages

Qin further asserts that the jury's finding of $850,000 "is completely

speculative, but even if it were correct, it would not be a recognized measure of damages." When properly pleaded and proved, consequential damages also may be recoverable. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816–17 (Tex. 1997) ("At common law, actual damages are either 'direct' or 'consequential.'"). For consequential damages to be recoverable, they must be foreseeable and directly traceable to and result from the fraud. *Arthur Andersen*, 945 S.W.2d at 816 ("[I]f [consequential] damages are too remote, too uncertain, or purely conjectural, they cannot be recovered.").

In Question 12 the jury was asked "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Yang for her damages, if any, that were proximately caused by Qin's fraud?" The charge then instructed the jury on the definition of proximate cause and instructed them to answer each damages question separately. Finally, the charge instructed the jurors to consider "Yang's economic damages that, in reasonable probability, will be sustained in the future."

Consequential damages are recoverable only if the misrepresentation is a producing cause of the loss, i.e. if the losses are foreseeable and directly traceable to and result from the misconduct. *Arthur Andersen*, 945 S.W.2d at 817; *see Formosa Plastics*, 960 S.W.2d at 49 n. 1 ("When properly pleaded and proved, consequential damages that are foreseeable and directly traceable to the fraud and result from it might be recoverable."). And, unlike direct damages, consequential damages may include subsequent losses if those losses were reasonably foreseeable and have the requisite nexus to the wrong. *Arthur Andersen*, 945 S.W.2d at 817.

The jury found $850,000 in consequential damages proximately caused by Qin's fraud. Mizulski, Yang's expert, testified that if Yang wanted to seek an EB-5 visa she would need to begin the application process again. Mizulski testified that the "EB-5 modernization rule" raised the minimum investment from $1 million to

23

$1.8 million, almost double what Yang paid Qin. Therefore, it would cost Yang an additional $800,000 to pursue an EB-5 application and to be restored to the same position as she would have been had the fraud not occurred. The record does not reflect any other evidence of consequential damages to Yang. Qin did not object at trial that Mizulski's testimony was speculative or that she testified to an incorrect measure of damages.

On appeal Qin does not challenge the foreseeability of the consequential damages or whether those damages have the requisite nexus. Qin asserts that the fraud damages amount to a windfall for Yang because she also received the assets of Training. However, as discussed above, Qin failed to provide proof of the value of Training's assets and failed to request an offset of that value from the damages awarded by the jury.

Viewing all the evidence in the light most favorable to the jury's findings of consequential damages for fraud and considering any undisputed or conclusive contrary evidence, we conclude the evidence is legally insufficient to support the jury's finding of $850,000 in consequential damages, but is sufficient to support an award of $800,000 in consequential damages proximately caused by Qin's fraud. We sustain that portion of Qin's tenth issue that challenges the legal and factual sufficiency of the evidence to support the jury's finding of $850,000 in consequential damages.

### 3. Remittitur

A court of appeals may exercise its authority to suggest a remittitur when there is insufficient evidence to support the full amount of an award, but sufficient evidence to support a lesser award. Tex. R. App. P. 46.3; *see Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987) ("If part of a damage verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the

verdict. The party prevailing in the trial court should be given the option of accepting the remittitur or having the case remanded.").

Here, the evidence is legally insufficient to support the trial court's combined award of $1,850,000 in direct and consequential damages for fraud. The evidence, however, is sufficient to support an award of $1,800,000. Accordingly, we suggest to Yang a remittitur of $50,000. If timely accepted, we will modify the trial court's judgment to reflect the remittitur and an award of $1,800,000; otherwise, Yang's fraud claim shall be reversed and remanded for a new trial as to liability and damages. Tex. R. App. P. 46.3; *see Larson*, 730 S.W.2d at 641; *see also* Tex. R. App. P. 44.1(b) (appellate court "may not order a separate trial solely on unliquidated damages if liability is contested"); *Rancho La Valencia, Inc. v. Aquaplex, Inc.*, 383 S.W.3d 150, 152 (Tex. 2012) (applying Rule 44.1(b)).

## D. Qin did not preserve error on his argument that section 21.223 of the Business Organizations Code bars Yang's fraud claim.

In Qin's ninth issue he asserts that Yang's fraud claims are barred by section 21.223 of the Business Organizations Code, which provides in part:

(a) A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to:

. . .

(2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory. . ..

. . .

(b) Subsection (a)(2) does not prevent or limit the liability of a holder,

25

beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

Tex. Bus. Orgs. Code § 21.223.

Subsection (a)(2) prevents an individual from being held individually liable for certain claims unless the additional elements found in subsection (b) are proved. *TecLogistics, Inc. v. Dresser-Rand Group, Inc.*, 527 S.W.3d 589, 596–97 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

A complaint that section 21.223 bars a claim must be preserved for review by raising the issue in the trial court. *See Dodd v. Savino*, 426 S.W.3d 275, 290–91 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We conclude that appellants failed to preserve error on this issue. Qin did not raise the alleged bar under section 21.223 in the trial court or in his motion for new trial. *See* Tex. R. App. P. 33. Because Qin failed to preserve error for review, we overrule Qin's ninth issue. [6]

## IV. CONSTRUCTIVE TRUST

In Qin's third issue he asserts the trial court erred in awarding a constructive trust of Training's assets in addition to monetary recovery for fraud. The Entities and Tours-Texas also challenge the trial court's award of a constructive trust in their third issue.

A party is entitled to sue and seek damages on alternative theories, but it is not entitled to a double recovery. *Waite Hill Servs., Inc. v. World Class Metal Works,*

---

[6] Because we have upheld the jury's findings on fraud liability, and most of the damage award, we need not address appellants' issues challenging the breach-of-contract claims. *See Birchfield*, 747 S.W.2d at 367 (the trial court should utilize the findings affording the prevailing party the greater recovery and render judgment accordingly). We therefore overrule Qin's fourth and fifth issues and the Entities' eighth and ninth issues.

*Inc.*, 959 S.W.2d 182, 184 (Tex. 1998). A double recovery exists when the plaintiff recovers twice for the same injury. *Weeks Marine, Inc. v. Garza*, 371 S.W.3d 157, 162 (Tex. 2012); *Jang Won Cho v. Kun Sik Kim*, 572 S.W.3d 783, 805 (Tex. App.— Houston [14th Dist.] 2019, no pet.). "Under the one-satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered because of a particular injury." *Utts v. Short*, 81 S.W.3d 822, 831 (Tex. 2002); *accord Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006).

Appellants assert the trial court improperly awarded Yang a constructive trust in the assets of Training in addition to monetary damages for fraud. The flaw in appellants' argument, however, is that the constructive trust was not awarded as a remedy for fraud, but as a consequence of the declaratory judgment action.

In Yang's live pleading she sought a declaratory judgment declaring that she was the "sole Director, President, and Secretary of Training, whereby she is entitled to the exclusive corporate governance and management of Training." Yang further sought "immediate and exclusive possession and control of Training's original corporate records and documents, together with Training's tangible and intangible assets." The trial court granted a directed verdict on Yang's declaratory judgment claim. On appeal appellants have not complained about the trial court's directed verdict, but allege the court erred in awarding a constructive trust of Training's assets.

A court of appeals may not reverse a trial court judgment on a ground not raised. *Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 236 (Tex. 2008). "The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one." *United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring). This principle

27

extends to unchallenged rulings regarding damages. *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 782 (Tex. 2020).

The trial court's judgment awarded a constructive trust in Training's assets to Yang based on the court's directed verdict on Yang's declaratory judgment. We may not reverse the trial court's judgment on declaratory judgment because appellants have not challenged the trial court's ruling on the directed verdict. We therefore overrule appellants' third issues.

## V. CONSPIRACY

### A. Legally and factually sufficient evidence support the jury's conspiracy findings.

In Qin's fifteenth issue he contends Yang's conspiracy claim must fail because it is not supported by an underlying tort, the evidence is legally and factually insufficient to support each element of conspiracy, and Yang failed to properly prove damages against each appellant. The Entities assert an identical challenge in their tenth issue.

In Question 24, the jury was asked to answer the question if they had answered "Yes" to the questions on fraud, conversion, or tortious interference. Question 24 read as follows:

> Were two or more Defendants part of a conspiracy that damaged Yang?
>
> > To be part of a conspiracy, two or more Defendants must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to Yang. One or more persons involved in a conspiracy must have performed some act or acts to further the conspiracy.
>
> Answer "Yes" or "No" for each.
>
> 1. Nick Qin       <u>Yes</u>
> 2. Elina Qin       <u>No</u>

28

| | |
|---|---|
| 3. KL International Insurance Services, Inc. | <u>No</u> |
| 4. KL Tours Group, Inc. | <u>No</u> |
| 5. Qindom, LLC | <u>No</u> |
| 6. Riverstone Tours, Inc. | <u>Yes</u> |
| 7. US-China Professional Travel & Tours (Atlanta), Inc. | <u>Yes</u> |
| 8. US-China Professional Transportation, Inc. ("Transportation") | <u>Yes</u> |
| 9. Arendelle Group, LLC | <u>Yes</u> |
| 10. Arendelle Management, Inc. | <u>Yes</u> |
| 11. US-China Professional Tours (New York), LLC | <u>Yes</u> |
| 12. US-China Professional Tours (New Jersey), Inc. | <u>Yes</u> |

Appellants first assert that the jury's conspiracy findings are not supported by sufficient evidence because there is legally and factually insufficient evidence of an underlying tort. Conspiracy is a derivative tort because a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Having found legally and factually sufficient evidence to support the jury's findings of fraud, we reject appellants' first contention that there was no proof of an underlying tort.

Appellants next assert the evidence is legally and factually insufficient to support all elements of conspiracy. Civil conspiracy is a theory to secure joint and several liability against members of a conspiracy for the harm caused by any one member of the conspiracy. *Comcast Corp. v. Houston Baseball Partners LLC*, 627 S.W.3d 398, 421 (Tex. App.—Houston [14th Dist.] 2021, pet. dism'd). A defendant's liability for conspiracy depends on participation in some underlying tort

for which the plaintiff seeks to hold at least one of the named defendants liable. *Id*. To prevail on a claim for civil conspiracy, the plaintiff must establish: (1) a combination of two or more persons; (2) an object to be accomplished (either an unlawful purpose or a lawful purpose by unlawful means); (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). An actionable conspiracy must consist of acts that would have been actionable against the conspirators individually. *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*, 217 S.W.3d 653, 668 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). Once a civil conspiracy is proved, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy. *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983).

Appellants specifically challenge the evidence to support that they had a meeting of the minds to pursue an object or course of action that was unlawful. Citing *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854 (Tex. 1968), appellants argue there was legally and factually insufficient evidence of a preconceived plan or unity of design and purpose.

As noted by the court in *Schlumberger*, proof of a conspiracy must usually be made by circumstantial evidence. *Id*. at 858. Conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex. 1963). It is not required that each and every act of a conspirator be shown to have been in concert with the others or that it be established by direct evidence that all combined at a given time prior to each transaction. *Id*. at 582. Inferences of concerted action may

be drawn from joint participation in the transactions and from enjoyment of the fruits of the transactions. *Id*.

There is abundant evidence that the Entities, acting through Qin, enjoyed the fruits of Qin's fraud. For example, Qin admitted that he purchased the business condominium with Yang's investment funds and that he arranged the real estate transaction before he received her final installment. Qin further admitted using Yang's investment to fund the Entities and purchase vehicles for use by those Entities.

The circumstances in this case are substantially different from the circumstances in *Schlumberger*. The alleged conspirators in *Schlumberger* were independent entities who presumably were dealing with each other in arms-length transactions entered into for the parties' mutual benefit. 435 S.W.2d at 857. The alleged conspirators in this case were Qin and the entities he controlled.

Viewing all the evidence in the light most favorable to the jury's findings of conspiracy and considering any undisputed or conclusive contrary evidence, we conclude a reasonable jury could have concluded that Qin and the Entities engaged in conspiracy. Considering all the evidence, we cannot say that the credible evidence supporting the jury's finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside.

Finally, under these issues appellants assert Yang failed to prove damages for conspiracy because she failed to obtain a separate jury finding on the amount of damages caused by the conspiracy.

"The gist of a civil conspiracy is the damage resulting from commission of a wrong which injures another, and not the conspiracy itself." *Schlumberger*, 435 S.W.2d at 856. The trial court awarded Yang damages jointly and severally on her

31

fraud claims from Qin, Elina, and the Entities. Although the conspiracy question in the charge was predicated on affirmative answers to fraud, conversion, and tortious interference, the trial court only awarded damages based on fraud.

Citing *THPD, Inc. v. Cont'l Imports, Inc.*, 260 S.W.3d 593, 605 (Tex. App.—Austin 2008, no pet.), appellants assert Yang was required to obtain a separate jury finding of damages that resulted from the conspiracy. We disagree. The damages recoverable in an action for civil conspiracy are those damages resulting from the commission of the wrong, not the conspiratorial agreement. *See Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).

The cases cited by appellants are distinguishable in that in those cases the evidence suggested that divisible damages arose from multiple underlying torts only some of which were the subject of the conspiracy, *see THPD, Inc.*, 260 S.W.3d at 605, or a separate damage question was required to reflect the timing and scope of the conspiracy. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017).

When the evidence shows that all conspiracy defendants were involved from the very beginning as to the underlying tort, a separate finding of causation and damages for each conspiracy defendant is not required. *Parker*, 514 S.W.3d at 224. Because in this case all damages were caused by the underlying tort of fraud, a separate finding of damages caused by the conspiracy was not required. We overrule Qin's fifteenth issue and the Entities' tenth issue.

## B.     The trial court erred in assessing damages against Elina.

In Elina's fifth and sixth issues she asserts the trial court erred in entering judgment against her because the jury only found liability and damages caused by Elina on Yang's conversion claims. In the final judgment the trial court ordered

recovery of damages jointly and severally on Yang's fraud claims from Qin, Elina, and the Entities. In a footnote, the trial court stated that "Defendant Elina Qin shall be jointly and severally liability for up to $111,111.00 in actual damages." As noted above, the trial court did not render judgment on the jury's findings of conversion. On the fraud claims the jury was asked whether Qin committed fraud and whether Elina and the Entities conspired to commit an underlying tort. The jury found that Qin committed fraud and that the Entities conspired with Qin. In answer to the question on the conspiracy claim, the jury found that Elina had not conspired with Qin and the Entities.

A finding of civil conspiracy further imposes joint and several liability on all conspirators for actual damages resulting from acts in furtherance of the conspiracy. *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 90 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Because the jury did not find that Elina participated in the conspiracy, she is not jointly and severally liable for fraud. *See id.* The trial court's award of damages for which Elina is jointly and severally liable is not supported by the jury's verdict. *See Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 101 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (jury finding on direct liability theory did not support trial court's judgment of joint and several liability). We sustain Elina's fifth and sixth issues. We modify the trial court's judgment to delete the assessment of damages against Elina.

## VI. EVIDENTIARY ISSUES

Having addressed appellants' issues that if sustained would require rendition we now turn to their issues challenging exclusion of certain evidence, submission of an issue to the jury, and grant of a no-evidence summary judgment.

33

**A. Appellants did not preserve error with regard to exclusion of the Training Agreement.**

In Qin's sixteenth issue he challenges the trial court's exclusion from evidence of the Training Agreement. The Entities raise the same complaint in issue eleven, and Tours-Texas raises the same complaint in its first issue, but all parties refer to Qin's brief for argument on the issue.

Before trial Yang filed a motion in limine seeking to exclude the Training Agreement from evidence, and any mention of the agreement or the dismissed breach-of-contract claim. Yang asserted in her motion that admission of the Training Agreement or mention of it in testimony would be unduly prejudicial.[7] Qin argued at the hearing on the motion in limine that admission of the Training Agreement was probative because it set out Yang's percentage interest in Training, and stated that Yang would not interfere in the management of Training. The trial court granted the motion in limine on the Training Agreement.

After Yang testified, Qin called her back to the stand for the purpose of a bill of exception on exclusion of the Training Agreement. Yang explained that the immigration attorney rejected the agreement because it gave only 51 percent of the shares to Yang, which would not satisfy the EB-5 process. For the EB-5 program to be satisfied Qin had to create a new company for Yang. At the end of the proffer, the following exchange occurred:

> [Qin's counsel]: Okay. Your Honor, just so we're clear on that, because I don't think I've ever formally offered it and the Court's formally rejected it. He addressed it in a motion in limine, but that's a little different. But as I understand the Court's ruling, you're disallowing this

---

[7] Although neither party referenced the Rules of Evidence in seeking admission or exclusion of the Training Agreement, we presume from the hearing on the motion in limine that Yang objected pursuant to Rule of Evidence 403, which would act to exclude evidence the trial court deemed relevant, but more prejudicial than probative.

as evidence.

THE COURT: I'm disallowing this as evidence.

Qin asserts in his brief that exclusion of the Training Agreement "precludes an alleged preceding oral contract on the same subject matter." Qin does not, on appeal, complain as he did at trial, that the Training Agreement is probative because it shows the parties' percentage shares in Training or Qin's mandate to "operate" Training. In fact, Qin admitted in his deposition that he did not follow the Training Agreement's allocation of shares on the advice of counsel because allocation of only 51 percent of the shares to Yang would not comply with the requirements of the EB-5 program. Appellants failed to preserve error for appeal because their issues on appeal do not comport with the complaint raised in the trial court. *See Doan v. TransCanada Keystone Pipeline, LP*, 542 S.W.3d 794, 807 (Tex. App.—Houston [14th Dist.] 2018, no pet.). We overrule Qin's sixteenth issue, the Entities' eleventh issue, and Tours-Texas's first issue.

## B. Appellants did not preserve error regarding exclusion of testimony about a $90,000 check.

In Qin's seventeenth issue and the Entities' twelfth issue, appellants contend the trial court erred in excluding testimony relating to a cashier's check from Training payable to the law firm of Nguyen and Chen. In both appellants' opening briefs, this issue is raised but neither brief presents an argument for why testimony about the $90,000 check should have been admitted.

Although we construe briefs liberally and require only substantial compliance with briefing rules, *see* Texas Rule of Appellate Procedure 38.9, if an appellant's issues are unsupported by clear and concise legal argument with appropriate citations to authorities, the appellant waives error. *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931–32 (Tex. App.—Houston [14th Dist.] 2008, no pet.). It

is not our duty to fashion a legal argument for a party. *See Canton-Carter*, 271 S.W.3d at 931-32; *see also Smith v. Smith*, 541 S.W.3d 251, 260-61 (Tex. App.—Houston [14th Dist.] 2017, no pet.). A party must not only cite relevant authority and the record but must also provide substantive legal analysis. *Burton v. Prince*, 577 S.W.3d 280, 292 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Appellants failed to provide substantive legal analysis as to why testimony about the check should not have been excluded. We overrule Qin's issue seventeen and the Entities' issue twelve.

## C. The trial court did not abuse its discretion in admitting expert testimony.

In Qin's twelfth issue he asserts the trial court abused its discretion in allowing Mizulski to testify that "federal immigration law created a duty between Nick Qin; that Nick Qin had breached that duty; Yang was damaged because of the breach of that duty; Yang was damaged by $1.85 million dollars by that breach of duty; and that Nick Qin had 'converted' funds belong[ing] to Yang[.]"

Before trial Qin filed a motion to exclude the expert testimony of Mizulski on the grounds that her testimony was inadmissible because she planned to testify about questions of law, and her opinion was unreliable. At trial, Qin repeated his objections, and the trial court overruled them. On appeal Qin does not complain about the reliability of Mizulski's testimony but asserts only that her testimony was inadmissible because she testified on questions of law.

The admissibility of expert testimony is governed by Rule of Evidence 702. Expert testimony is admissible if (1) the expert is qualified and (2) the testimony is relevant and based on a reliable foundation. *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006). Qin does not challenge Mizulski's qualifications or the reliability of her testimony, but challenges whether her testimony was admissible on legal issues. We review the trial court's determination that expert

testimony is admissible for abuse of discretion. *Greenberg Traurig*, 161 S.W.3d at 93–94 (citing *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002)). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *Id*.

An expert may state an opinion on a mixed question of law and fact if the opinion is limited to the relevant issues and is based on proper legal concepts. *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 619–20 (Tex. 1999). An issue involves a mixed question of law and fact when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard. *Mega Child Care, Inc. v. Texas Dep't of Protective & Regulatory Servs.*, 29 S.W.3d 303, 309 (Tex. App.—Houston [14th Dist.] 2000, no pet.). An expert, however, may not testify on pure questions of law. *Id.* at 309. Thus, an expert is not allowed to testify directly to her understanding of the law, but may only apply legal terms to her understanding of the factual matters in issue. *Greenberg Traurig*, 161 S.W.3d at 94.

Qin does not complain about Mizulski's testimony as it relates to fraud, but asserts that Mizulski inappropriately testified that Qin breached a fiduciary duty owed to Yang under federal law. We disagree. The record reflects that Mizulski testified generally to the requirements of the EB-5 visa immigration program. She testified that investments under the EB-5 program "require a high level of trust . . . because of the amount of money that's involved[.]" Mizulski testified that federal case law requires a business plan outlining how the investment funds will be used. Mizulski testified that Qin was required to use Yang's investment funds according to the business plan prepared in conjunction with the EB-5 application.

In testifying about the legal requirements of the EB-5 program Mizulski permissibly testified about the standard or measure that is fixed by law. Mizulski then opined that Qin failed to follow that standard. In that regard Mizulski offered

an opinion on a mixed question of law and fact regarding whether Qin's actions violated federal law. *See, e.g. Mega Child Care, Inc.*, 29 S.W.3d at 309–10 (testimony on whether day care center violated Human Resources Code was admissible as mixed question of law and fact).

We conclude the trial court did not abuse its discretion in admitting Mizulski's testimony at trial and overrule Qin's twelfth issue.

## VII. PARTIAL SUMMARY JUDGMENT

In Tours-Texas's second issue, it challenges the trial court's grant of no-evidence summary judgment on its breach-of-contract claim filed against Yang. Tours-Texas filed a petition in intervention in which it alleged, inter alia, that Yang entered into an agreement with Tours-Texas, not Qin, regarding Yang's investment in Training. Tours-Texas's breach-of-contract claim was based on the Training Agreement. Yang filed a motion for no-evidence summary judgment in which she alleged that Tours-Texas furnished no evidence that the Training Agreement was a valid contract, that Yang or Qin were to perform under the Training Agreement, that Yang breached the agreement before Tours-Texas, or that Tours-Texas suffered any damages.

Among the elements needed to defeat Yang's no-evidence summary judgment motion on Tours-Texas's breach-of-contract claim, Tours-Texas needed to present evidence creating a fact issue on whether it performed or tendered performance under the Training Agreement. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). Even if we assume, without deciding, that the Training Agreement was a valid contract,[8] we conclude that Tours-Texas failed to

---

[8] Tours-Texas never produced an agreement signed by both parties. The agreement contains a typed signature from Yang but was not signed by Qin or another representative of Tours-Texas. In response to the motion for summary judgment Tours-Texas relied on the bankruptcy court's Order Confirming Plan in which the court ordered that Tours-Texas assumed the Training

38

produce evidence that raised a genuine issue of material fact that Tours-Texas performed under the contract before Yang's alleged breach. Although, in response to a no-evidence motion for summary judgment, the nonmovant "is not required to marshal its proof" on a challenged element, it must still "point out evidence that raises a fact issue on the challenged element[ ]." Tex. R. Civ. P. 166a(i) cmt.; *see Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex. 2002).

The Training Agreement required Tours-Texas to:

- Prepare "all ground works" to be ready for Yang's investments in the branch office and register and incorporate the branch office company at the local government;

- Hire professional accountants to prepare 3 year and 5 year financial budgets for the company according to US government's requirements;

- Hire US immigration attorneys and professional business attorneys and adequately prepare all required documents;

- Be responsible "to operate and manage the Company independently and will provide 10 employment positions at all time[s] in accordance with USCIS accepted standards"; and

- Assist Yang, after being immigrated, in contacting schools, providing transportation, and other requirements during settlement in the U.S.

The Training Agreement required Yang to:

- Prepare "all ground works" for the investment and provide proof of investment and all other documents required by USCIS;

- Timely, accurately, and truthfully provide Tours-Texas and the immigration attorney with personal, financial, and other

---

Agreement. Section 365 of the Bankruptcy Code authorizes a bankruptcy trustee to assume or reject executory contracts and prescribes how that authority is to be exercised. 11 U.S.C. § 365. Although the statute does not include a definition of executory contract, the United States Supreme Court has stated that "Congress intended the term to mean a contract 'on which performance is due to some extent on both sides.'" *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522, n.6 (1984).

information to meet the requirements of USCIS;

- Pay all attorney's fees necessary to process the immigration application; and

- Provide no less than $1 million in investment funds and pay all necessary fees for the immigration program.

In response to Yang's motion, Tours-Texas focused on Yang's attempts to obtain control of the operations of Training. Tours-Texas failed to present evidence, however, that it complied with its obligations under the Training Agreement before Yang called a shareholders' meeting. In fact, Qin, Tours-Texas's owner, admitted in his deposition that he purchased a "business condominium" with Yang's investment funds, but put the title of the business condominium in Arendelle's name. Qin further admitted that he did not use Yang's investment to create a business for her that would create ten new jobs, but he used her investment to fund his other businesses in addition to personal expenses. "It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (quoting *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004)). Yang's alleged breach of the Training Agreement did not occur until after Tours-Texas failed to perform under the contract. Not only did Qin fail to present evidence of Yang's prior breach, he admitted that he breached the contract. Therefore, we conclude that the trial court did not err when it granted summary judgment in Yang's favor on Tours-Texas's breach-of-contract claim. We overrule Tours-Texas's second issue.[9]

---

[9] We need not address appellants' issues challenging the jury's findings on conversion, breach of fiduciary duty, tortious interference with a contract, or money had and received because the trial court did not render judgment on those findings. We therefore overrule Qin's issues eleven, thirteen, and fourteen and the Entities' issues four, seven, and ten.

40

## VIII. CONCLUSION

Because the evidence is legally and factually sufficient to support the jury's fraud findings, we affirm the trial court's judgment of fraud. Because the jury did not make any findings justifying an award of damages against Elina, we sustain Elina's fifth and sixth issues and delete the trial court's award of joint and several liability as it pertains to Elina. We affirm the trial court's judgment as modified.

Because the evidence is insufficient to support the total amount of consequential damages the jury awarded, we sustain that portion of Qin's tenth issue that challenges the legal and factual sufficiency of the evidence to support the jury's finding of $850,000 in consequential damages. In this situation, we may suggest a remittitur, and we do so here. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 124 (Tex. 2009). If Yang files a remittitur within twenty days from the date of this opinion, we will modify the trial court's judgment accordingly and affirm the judgment as modified. If the remittitur is not timely filed, we will reverse the trial court's judgment in part and remand this case for a new trial on the claims. Tex. R. App. P. 46.3; *see* Tex. R. App. P. 44.1(b) ("The court may not order a separate trial solely on unliquidated damages if liability is contested.").

/s/ Tracy Christopher
Tracy Christopher
Chief Justice

Panel consists of Chief Justice Christopher and Justices Bourliot and Wilson.